## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

James Grandson,

        Plaintiff,

vs.

Western Lake Superior Piping Industry
Pension Plan and Board of Trustees of
The Westen Lake Superior Piping
Industry Pension Plan,

        Defendants.

Case No. 23-cv-214 (JMB/LIB)

**PLAINTIFF'S MEMORANDUM
IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT**

---

**"Late Retirement Benefit"**

If you defer your benefits past your normal retirement date, your monthly
benefit will be increased relative to the normal retirement benefit because the
benefit is expected to be paid out over a shorter period of time. Your monthly
benefit is the actuarial equivalent of the normal retirement benefit."

(2015 Summary Plan Description)

## <u>INTRODUCTION</u>

James Grandson, who spent his career as a Plumber/Foreman, has been a participant

since 1978 in the Western Lake Superior Piping Industry Pension Plan ("Pension Plan"), a

multiemployer defined benefit pension plan. (46)[1]. The Board of Trustees of the Western

Lake Superior Piping Pension Fund is the Plan Administrator of the Pension Plan. (89).

---

[1] References to the Record and other documents produced by Defendants, WLSPI 0001-
1483, will cite to only the page number.

The Pension Plan had an Early Retirement Benefit, Normal Retirement Benefit, and a Late Retirement Benefit. (98-99). The Normal Retirement Age is 62. (87).

Grandson continued to work past the Pension Plan's normal retirement age of 62. In November 2019, the month before Grandson turned age 62, the Pension Plan's third-party administrator notified Grandson that his pension benefits would be delayed until he retired. (1). The Pension Plan permits the deferral of benefits. When a participant later retires, he is entitled to the Late Retirement Benefit, which is the greater of the participant's accrued benefit (which includes service and credits accrued beyond normal retirement age), or the actuarial equivalent of the pension benefit at Normal Retirement Age, to make up for the missed payments and the increased chance of mortality as a person ages. (99).

When Grandson inquired about his pension benefit in 2021, however, the third-party administrator informed him that he was not entitled to the actuarial equivalent of his normal retirement age benefit, because he had continued to work after Normal Retirement Age. Grandson questioned the third-party administrator's position based on the plain language of the Summary Plan Description ("SPD"). Ultimately, Grandson's questions were presented to the Trustees. At that point, the Trustees' then attorney ("prior Counsel") took charge and recommended that the Trustees issue a final determination denying Grandson an actuarial increase for his missed payments, skipping the Pension Plan claim process.

The Trustees later agreed to reconsider its decision, but their prior Counsel placed conditions on the reconsideration process. Defendants ultimately agreed that they were wrong as to the Variable Annuity Program benefit (which became effective January 1, 2021), but as to Plaintiff's defined pension benefit, Defendants again relied on their prior

Counsel and denied Plaintiff his entitlement to his full retirement benefit. The Defendants' prior Counsel misinterpreted both the Plan and the law and provided illogical explanations, which the Trustees should have at least questioned given their positions as Plan fiduciaries.

Plaintiff brought this action asserting a claim for clarification of his rights to an actuarial increase in his benefit due under the terms of the Pension Plan and asserting claims for breach of fiduciary duty. Defendants breached their fiduciary duties by misrepresenting the terms of the Pension Plan, assuming Defendants' position on its interpretation is correct; by failing to comply with disclosure and Plan requirements to the extent the notice sent to Grandson in 2019 was intended to qualify as a notice that his benefits were being forfeited by working; and by failing to conduct adequate investigation and due diligence regarding Grandson's claim.

Plaintiff filed his Complaint on January 27, 2023, to meet the statute of limitations set out in the final denial letters. On March 15, 2023, Defendants brought a Motion to Dismiss Plaintiff's claims. (Doc. 11-16). The Court denied Defendants' Motion as to Plaintiff's benefit due claim and granted Defendants' Motion as to the fiduciary breach claims, without prejudice to Plaintiff's right to move to amend the Complaint. (Doc. 22). Plaintiff did so (Docs. 32-35), which Defendants also challenged. (Doc. 38). The Court granted Plaintiff's Motion to amend the Complaint, finding sufficient facts to allow the Court to make a reasonable inference that a breach of fiduciary duty occurred and finding Defendants' arguments unpersuasive and uncompelling. (Doc. 40).

Plaintiff now seeks summary judgment against Defendants clarifying that he is entitled to the actuarial equivalent of his Normal Retirement Benefit under the terms of the

Pension Plan or, alternatively, that he is entitled to equitable relief for Defendants' breaches of fiduciary duty.

**RELEVANT CODE REQUIREMENTS AND PLAN LANGUAGE**

**A.**    **ERISA/Internal Revenue Code Requirements.**

Section 203(a) of ERISA requires each pension plan to "provide that an employee's right to his normal retirement benefit is nonforfeitable upon the attainment of normal retirement age." 29 U.S.C. § 1053(a). Ordinarily, federal law requires qualified retirement plans to compensate retirees for any deferral (or suspension) of pension payments by way of an actuarial adjustment—or increase in payments—to account for the missed payments, and the increased chance of mortality as a person ages. Treas. Reg. §§ 1.411(a)–7(a)(1)(ii), 1.411(c)–1(e)(1) (2023). Nevertheless, federal law makes an exception and *permits* retirement plans to forego making actuarial adjustments for employees who work in ERISA § 203(a)(3)(B) service. The corresponding regulation sets out the permissive limits for a plan to suspend and forfeit benefits. 29 C.F.R. § 2530.203; *Eisenrich v. Minneapolis Retail Meat Cutters and Food Handlers Pension Plan,* 574 F.3d 644 (8th Cir. 2009); *Atkins v. Northwest Airlines, Inc.,* 967 F.2d 1197, 1202 (8th Cir. 1992).

The regulation states that a plan *may* provide for the permanent withholding of a monthly benefit during which an employee is employed in "§ 203(a)(3)(B) service" described in § 2530.203-3(c)(2) for multiemployer plans. Generally, § 203(a)(3)(B) service is employment in the same industry and trade in which the employee was employed and covered for benefits. The regulation requires that before any payment can be forfeited the plan to notify the employee that benefits are being suspended and to include a description

of the specific reasons why benefit payments are being suspended, a general description of the plan provisions relating to the suspension of payments, a copy of such provisions, a statement where the applicable regulations may be found, and notice of the plan's procedure for affording a review of the suspension of benefits. 29 C.F.R. § 2530.203-3(b)(4).

ERISA requires a plan administrator to provide an SPD of a benefit plan written in a manner calculated to be understood by the average plan participant that is "sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." 29 U.S.C. §§ 1022(a), 1024(b).

**B.**    **Relevant Plan Provisions.**

The Normal Retirement Age under the Pension Plan is age 62. (87).  On the date Grandson reached normal retirement age, the Pension Plan in effect at the time was the 2015 Restatement, effective January 1, 2015, as amended ("2015 Plan").  The 2015 Plan provides for an Early Retirement Benefit, Normal Retirement Benefit, and Late Retirement Benefit. (139) (Fifth Amendment to 2015 Plan). If a participant does not apply for benefits at Normal Retirement Age, the Plan will deem the participant to have elected to *defer* benefits. (*Id.*).

The 2015 Plan provides that benefits can be "permanently suspended" upon reemployment after commencing benefits:

**6.07 Suspension Of Benefits Upon Reemployment *After* Retirement Date**

    (a) <u>Suspension For Disqualifying Employment</u>

        If a Participant has commenced receiving benefit payments, the Participant's monthly benefit will be permanently suspended for each month in which the Participant works in Disqualifying Employment to the extent that the Participant's benefit payments are not Required Minimum Distributions.

             * * *

    (c) On commencement of pension payments, the Trustees shall notify the Participant of the Plan rules governing suspension of benefits. If benefits have been suspended and payment resumed, new notification shall, upon resumption, be given to the Participant, if there has been any material change in the suspension rules or the identity of the industries or area covered by the Plan.

             * * *

    (d) The Trustees shall notify each *retired* Participant whose benefit payments are suspended pursuant to this section of such suspensions, in writing, by personal delivery or first class mail, during the first calendar month in which such suspension takes place. Such notification shall contain the following information:

        (i)     A statement of the specific reason why benefits payments are being suspended;

        (ii)    a general description of the Plan provisions relating to the suspension of benefits;

        (iii)   a copy of such Plan provisions; and

        (iv)   a statement referring to the Regulations in 29 C.F.R. §2530.203-3.

(107-108) (emphasis added).

    Although Section 6.07 capitalizes the terms, "Disqualifying Employment," indicating it was a defined term, the Plan did not include a definition until it was amended effective May 1, 2019:

Forty (40) or more hours of employment in the same industry covered by the plan, in same geographic area covered by the plan at the time that the participant commenced benefits, and in the same trade or craft that the participant was employed in at any time under the plan. Employment includes employment with a contributing employer, a non-contributing employer, and self-employment. For purposes of Disqualifying Employment, the term "industry" means the business activities of the types engaged in by any Employer contributing to the Plan.

(131).

The 2015 Plan provides the following regarding the amount of the Late Retirement

Benefit:

Late Retirement Benefit. A Participant's retirement benefit on a Late Retirement Date shall be equal to the greater of (1) or (2) below:

(i)      The Accrued Benefit on the Late Retirement Date.

(ii)     The Actuarial Equivalent of the Normal Form on the Normal Retirement Date. However, no actuarial increase will be provided for months in which a Participant engages in Disqualifying Employment if the provisions of 29 C.F.R. § 2530.203-3 are satisfied.

Effective February 26, 2010, the Actuarial Equivalent Late Retirement Benefit will be no less than the benefit determined using the adjusted First segment rate under Section 1.04(d)(i) and the mortality table under Section 1.04(d)(ii).

(99).

The Summary Plan Description for the 2015 Plan ("2015 SPD") states the following

regarding under the heading "WHEN CAN I BEGIN RECEIVING A PENSION?":

You may elect to defer your benefits past your normal retirement date. You are eligible for a late retirement benefit if you are vested and you retire after attaining age 62 (or if you do not apply for benefits until after attaining age 62) and you submit an application for late retirement benefits. If you do not apply to commence benefits on (or before) your normal retirement date, you will be deemed to have elected to defer your benefits. However, you may not defer benefits beyond your required beginning date (April 1 of the calendar year following the calendar year in which you reach age 70½).

7

(222).

The 2015 SPD describes the amount of the Late Retirement Benefit as

follows:

> If you defer your benefits past your normal retirement date, your monthly
> benefit will be increased relative to the normal retirement benefit because the
> benefit is expected to be paid out over a shorter period of time. Your monthly
> benefit is the actuarial equivalent of the normal retirement benefit.

(224).

The only discussion in the 2015 SPD regarding the suspension of benefits is found

under the heading, "WHAT HAPPENS IF I RESUME WORKING AFTER I RETIRE?":

> You are not entitled to benefits for any month in which you work 40 hours or
> more in disqualifying employment…Contact the Third Party Administrator
> before resuming employment to find out whether a job you are considering
> will be disqualifying employment.
>
> After you begin receiving benefits, you must notify the Third Party
> Administrator immediately if you resume working in the industry and
> geographical jurisdiction of the Union. You must also respond to any inquiry
> from the Third Party Administrator regarding whether you are working in
> disqualifying employment. . . .
>
> If your benefit payments are suspended due to disqualifying employment,
> you will be notified in writing during the first calendar month of the
> suspension. Your benefits will not be suspended unless you are provided a
> notice of suspension. The notification will contain the following information:
> a statement of the specific reason why your benefit payments are being
> suspended; a general description of the Plan document provisions relating to
> the suspension of benefits; a copy of such Plan provisions; and a statement
> referring to the federal suspension of benefits regulations in 29 C.F.R.
> §2530.203-3. Notify the Third Party Administrator immediately if you cease
> working in disqualifying employment.

(226).

The Pension Plan was again amended and restated in its entirety effective August 31, 2020, and amended several times thereafter ("2020 Plan").[2] (140-216). The 2020 Plan is the same as the 2015 Plan, except for minor word changes, regarding the relevant sections discussed above. The 2020 Plan (like the 2015 Plan) grants sole discretionary power to the Board of Trustees to construe the Plan and determine all facts relevant to the administration of the Plan, and to determine all questions that may arise under the Plan. (169).

The SPD was also restated effective January 1, 2021 ("2021 SPD"). Like the 2015 SPD, the 2021 SPD explains under the heading "WHEN CAN I BEGIN RECEIVING A PENSION BENEFIT?" that the participant will be deemed to have elected to defer his benefits if he does not commence benefits on or before normal retirement date. The 2021 SPD's description of the Late Retirement Benefit was changed to reflect the Plan "greater of" language:

> If you defer your benefits past your normal retirement date, your monthly benefit will be increased relative to the normal retirement benefit because the benefit is expected to be paid out over a shorter period of time. Your monthly benefit is the greater of (a) your accrued benefit as of your late retirement date or (b) the actuarial equivalent of the normal retirement benefit. The monthly amount of the late retirement benefit is adjusted if you elect a form of benefit other than the normal retirement benefit.

(244).

---

[2] The 2020 Restatement Pension Plan was amended to add a Variable Annuity Benefit Program. Effective January 1, 2021, the Pension Fund maintained two benefit programs – a Defined Benefit Program and a Variable Annuity Program. The Defined Benefit Program pays benefits with respect to Past and Future Service Credits earned before January 1, 2021, and the Variable Annuity Program pays benefits with respect to VAP Credits earned on or after January 1, 2021. (146).

The 2021 SPD, like the 2015 SPD, discusses Disqualifying Employment under the heading: "WHAT HAPPENS IF I RESUME WORKING AFTER I RETIRE?" However, the 2021 SPD is stated differently and more clearly informs the participant that benefits can be "permanently" suspended for working in Disqualifying Employment. However, the 2021 SPD continues to state that Disqualifying Employment can occur only after benefits are commenced. (245-246). The notice that must be provided by the Plan before benefits can be permanently suspended or forfeited is the same as in the 2015 SPD. (246).

## FACTUAL BACKGROUND[3]

Shortly before Grandson turned 62, Third Party Administrator Wilson-McShane Corporation, sent a letter dated November 1, 2019, to Grandson with the subject line: "Suspension of Retirement Benefits Notice" and enclosing a Notice of Suspension of Retirement Benefits. The letter stated that government regulations require all pension plan participants who reach normal retirement age to receive the notice. The letter explained what the term "suspension" meant:

> Suspension (the term the government uses) refers to the fact that, had you actually retired at age 62, you would have been entitled to a benefit at that time. However, since you did not retire, commencement of your benefits will be delayed until you actually retire. In other words, you will not receive any benefits as long as you remain employed, and the benefits you could otherwise have received are considered "suspended."

---

[3] Because the Benefits Due claim is based on a review of the Record, and the Fiduciary Breach claims are not so limited, the discussion of the facts in this section will only refer to facts contained in the Record. Any facts outside of the Record will be confined to the section on the Fiduciary Breach claims. The Record consists of bates numbers WLSPI 0001-258, 1222-1259.

Neither the cover letter nor the Notice stated that Grandson was working in Disqualifying Employment. The Notice did not include the information required by the regulations or the Pension Plan to qualify as notice that benefits would be permanently suspended. The Notice did not inform Grandson that he had a right to appeal nor did the Notice give Grandson reason to appeal.

In mid-2021, Grandson planned to retire and inquired about his pension amount. His inquiry led to discussions about his entitlement to an actuarial increase for the delay in his benefit. (4-5)[4]. On November 8, 2021, the Board consented to Wilson-McShane requesting Grandson to put his questions in writing to allow their prior Counsel to review and provide a response by their next meeting. (55-59). Wilson-McShane sent a letter to Grandson asking him to prepare a letter with his "specific questions and inquiries" for the Board to review and provide a response. (4). On January 13, 2022, Grandson sent a two-paragraph email stating that the Plan and SPD require that his pension benefit be actuarially adjusted and that failing to do so would violate 29 C.F.R. § 2530.203-3. (5).

Prior Counsel prepared a response letter and sent it to Wilson-McShane. (12-15). There is no evidence the response was sent to the Trustees. Counsel's response labeled it the "final determination on your appeal." (13). The letter stated because Grandson's communication was "purely a legal question," the Board decided his "appeal" on its merits "without the need to make any determination regarding the particulars" of his benefit. (*Id.*). The letter concluded that Grandson's request is contrary to the terms of the Plan, without

---

[4] None of the discussions Grandson had with Wilson-McShane were documented or if documented were not produced by Defendants.

discussing the terms of the Plan, and reasoning that the Late Retirement Benefit provision is permissible under the law. (15).

Prior Counsel's response was addressed at the Board's February 9, 2022, meeting. The minutes of the meeting indicate that the Board did not have Grandson's email or the response prior to the meeting. The minutes, which consist of one short paragraph, state the Board approved of Counsel's draft, without any documentation of the Board's discussion. (63-64). Prior Counsel sent the appeal denial letter to Grandson the following day. (12).

On April 12, 2022, Prior Counsel sent an email to Trustees stating he was aware that Grandson had requested meetings with Trustees to further discuss his pension and recommended that they not engage in oral communication with Grandson. (1222).

On August 8, 2022, Grandson sent a nine-page letter addressed to the Trustees requesting a reconsideration of their decision. (22-31). Grandson provided a thorough explanation, going through the determination letter point by point, showing that the terms of the 2020 Plan and SPD did not support the decision. He argued that he could not be working in Disqualifying Employment because he had not commenced his benefits. He also explained that the Suspension of Retirement Benefits Notice dated November 1, 2019, did not mention Disqualifying Employment nor that he would not receive the actuarial equivalent of his benefit when he retired. He criticized the Trustees for allowing the Plan professionals to change the Plan without their approval. He provided the legal requirement for the format of an SPD relating to limitations and other restrictions of plan benefits. He compared the Plan language with the regulation at issue.

Grandson's letter was not provided to the Trustees, but it was discussed at the Board's August 30, 2022, meeting. (67-68). Prior Counsel stated that Grandson presented new claims and recommended consideration of his arguments. (*Id.*) Prior Counsel sent a letter dated September 6, 2022, to Grandson informing him the Trustees agreed to reconsider his matter *if* he agreed to certain conditions, which included no tolling of the deadline to file a lawsuit and no reasserting arguments previously addressed. (31-32). The next day, prior Counsel and Grandson spoke wherein prior Counsel proposed that the Plan would pay for an attorney of his choice if he agreed to abide by the Board's decision. (33). Grandson sent prior Counsel a letter on September 13, 2022, declining the offer of an attorney and commenting that the Trustees had been going by prior Counsel's recommendations for many years. (34).

Around this time, Grandson completed a pension application but requested that it not be processed unless the Board decided in his favor. (46-54). As part of his application, Grandson was required to affirm that he had read and understood the "Post-Retirement Employment Restrictions" regarding retirement, disqualifying employment and notification of re-employment. (48).

On October 20, 2022, Wilson-McShane sent an email to prior Counsel attaching the suspension of benefits notice sent to Grandson in 2019 and a statement of how it handles the late retirement process. (36). He stated that each year they send to participants in the month they turn age 62 the Notice of Suspension of Benefits, a copy of Section 3.06 from the Plan, and an application for pension benefits. (*Id.*)

A Memorandum dated November 6, 2022, was prepared by prior Counsel stating he had reviewed the relevant documents and facts as directed by the Trustees. (41-42). Counsel's Memorandum decision focused only on the part of Section 3.06(c)(ii) that states: "However, no actuarial increase will be provided for months in which a Participant engages in Disqualifying Employment if the provisions of 29 C.F.R. § 2530.203-3 are satisfied." He acknowledged that the Plan language defining Disqualifying Employment, which states it applies to those participants who have commenced benefits, was a "glitch" but recommended that the Trustees interpret "Disqualifying Employment" to include Grandson's situation of continuously working in covered employment "before commencing benefits." (42).

Prior Counsel discussed his Memorandum at the next Board meeting on November 8, 2022. (73-74). As with the last Board's decision, the minutes consist of one paragraph, mostly of Counsel's discussion of his Memorandum. The Board decided to follow Counsel's recommendation. On November 9, 2022, Prior Counsel sent a letter to Grandson on behalf of the Trustees, stating that the Trustees were not persuaded by Grandson's argument that he was entitled to an actuarial increase because he was not working in Disqualifying Employment, for the following reasons:

- Grandson's interpretation is contrary to the meaning of the Plan established by longstanding practice.

- Grandson's interpretation would result in substantially different financial outcomes for similarly situation participants, with participants who return to work after commencing benefits not entitled to the late retirement increase, and participants who continue working but do not commence their benefits entitled to the late retirement increase.

14

- Grandson's interpretation is contrary to the principles of plan interpretation, because his interpretation would render the language of Section 3.06(c)(ii) meaningless.

- Grandson's interpretation ignores a portion of Section 3.06(c)(ii), because it expressly refers to 29 C.F.R. § 2530.203-3, which contains a broad definition of Section 203(a)(3)(B) service.

(43-44). The letter states that based on these reasons, the Board determined that Section 3.06(c)(ii) applies to participants who have not yet commenced receiving benefits. (44). The letter states that the decision supersedes the February 10, 2022, decision. (43). The letter concludes by stating that Grandson had now exhausted his administrative remedies, and that he must file a lawsuit by February 10, 2023. (45). The letter did not discuss the various Plan and SPD provisions which Grandson argued supported his claim.

## ARGUMENT

### A.    Standard of Review.

The standard of review in ERISA benefit due cases is *de novo* unless the Plan document expressly grants discretionary authority. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). If the Plan provides the administrator with discretionary authority, the court reviews the administrator's discretionary decisions under an abuse of discretion standard. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008). An exception to this is an administrator's interpretation of law, which is reviewed *de novo. Eisenrich,* 574 F.3d at 648-649; *Hogan v. Raytheon, Co.*, 302 F.3d 854, 855-856 (8th Cir. 2002).

The 2020 Plan states that the Trustees have sole discretion to interpret and administer this Plan. (142) Therefore, the discretionary decisions of the Trustees are entitled to a deferential review.

15

Where an administrator has discretionary authority, review of a benefits due claim by summary judgment is appropriate. The Court must follow the procedures outlined in Rule 56 and grant summary judgment only if "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." *Avenoso v. Reliance Standard Life Ins. Co.*, 19 F.4th 1020, 1026 (8th Cir. 2021). While the Court's review of the benefits due claim is based on the Record, the Court's determination on Plaintiff's fiduciary breach claims is not so limited. *Id.*; *Braden v. Wal-Mart Stores, Inc.,* 588 F.3d 585 (8th Cir. 2009).

Under abuse-of-discretion review, the court reverses the plan administrator's decision only if it was arbitrary and capricious, meaning it was unreasonable or unsupported by substantial evidence. *McIntyre v. Reliance Standard Life Ins. Co*., 73 F. 4th 993, 1000 (8th Cir. 2023). This does not mean that a court's review is a "rubber-stamp" of the administrator's decision. The court considers the entire record and determines whether a reasonable factfinder could reach the same outcome. *Avenoso*, 19 F.4th at 1025. The administrator's decision must be based on a reasonable interpretation of the plan's terms and supported by "substantial evidence" in the record before the plan administrator. *Eisenrich,* 574 F.3d at 648. Even under the deferential abuse-of-discretion standard, a plan administrator cannot contradict the plain language of an ERISA plan to deny benefits. *Knowlton v. Anheuser-Busch Cos. Pension Plan,* 849 F.3d 422, 429 (8th Cir. 2017).

In addition, where the defendant both funds the plan and decides the claim, it is operating under a conflict of interest which must be considered by the court. *Metropolitan Life Ins. Co. v. Glenn*, 54 U.S. 105 (2008). The court considers the conflict when

16

determining whether the trustee, substantively or procedurally, has abused his discretion. *Id.* at 116. A conflict of interest "should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision," and "prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decision making irrespective of whom the inaccuracy benefits. *Id.* at 117. A conflict of interest is just one factor among many case-specific factors that a reviewing judge should consider, reaching a result by weighing all factors together. *Id.* at 116.

**B.    Defendants' Determination Is Unreasonable.**

The Eighth Circuit has consistently recognized the primacy of written plan documents when resolving ERISA claims. *Vercellino v. Optum Insight, Inc.*, 26 F.4th 464, 469 (8th Cir. 2022) ("Courts are instructed to enforce the terms of ERISA plans as they are written."); *Admin. Comm. Of Wal-Mart Stores, Inc. Assocs.' Health & Welfare Plan v. Shank,* 500 F.3d 834, 838 (8th Cir. 2007) ("Among the primary purposes of ERISA is to ensure the integrity of written plans and to protect the expectations of participants and beneficiaries."). In reviewing administrators' plan interpretations, the court considers the following factors:

> whether their interpretation is consistent with the goals of the Plan, whether their interpretation renders any language in the Plan meaningless or internally inconsistent, whether their interpretation conflicts with the substantive or procedural requirements of the ERISA statute, whether they

> have interpreted the words at issue consistently, and whether their interpretation is contrary to the clear language of the Plan.

*Finley v. Special Agents Mut. Benefit Ass'n*, 957 F.2d 617, 621 (8th Cir. 1992). These non-exhaustive factors inform the court's analysis, but the ultimate question is whether the administrator's interpretation is reasonable. *King v. Hartford Life and Acc. Ins. Co.*, 414 F.3d 994, 999 (8th Cir. 2005). An interpretation that conflicts with the plain language of a plan is an abuse of discretion. Each provision of the plan should be read consistently with the others and as part of an integrated whole. *Bond v. Cerner Corp.*, 309 F.3d 1064, 1067–68 (8th Cir. 2002). "Words are to be given their plain and ordinary meaning as understood by a reasonable, average person." *Finley*, 957 F.2d at 622.

Defendants' decision is based only on the 2020 Plan even though the 2015 Plan was the applicable plan at the time Grandson turned age 62.[5] (43-45). The 2020 Plan was not approved by the Trustees until August 24, 2020. (141). The only part of the Plan referred to in support of Defendants' decision is the second sentence in Section 3.06(c)(ii) of the 2020 Plan, which states: "However, no actuarial increase will be provided for months in which a Participant engages in Disqualifying Employment if the provisions of 29 C.F.R. § 2530.203-3 are satisfied." (153). The key issue in that sentence is whether Grandson was working in Disqualifying Employment; yet the decision does not address the Plan definition other than to restate Grandson's argument. Instead, Defendants' interpretation of

---

[5] The 2015 Plan, as amended, applies to Grandson's claim from the date he reached age 62 through July 31, 2020. From August 1, 2020, through December 31, 2020, the 2020 Plan applies to his benefit.

Section 3.06(c)(ii) is based on alleged longstanding practice, inequity amongst participants, that the clause would be rendered meaningless, and that "Disqualifying Employment" should be interpreted based on 29 C.F.R. § 2530.203-3 rather than the Plan. Defendants' failure to consider the definition of the key terms "Disqualifying Employment," itself, constitutes an abuse of discretion. *Hayes v. Twin City Carpenters,* File No. 17-cv-05267), 2019 WL 3017747, *10 (D. Minn. July 10, 2019) (The law tilts in favor of finding an abuse of discretion where the administrator applied the wrong term or failed to adjudicate a claim under applicable terms). Defendants' interpretation of Section 3.06(c)(ii), that it applies to participants "who have not yet commenced receiving benefits," is directly contrary to the definition of Disqualifying Employment in the 2020 Plan: "Forty (40) or more hours of employment in same industry covered by the plan, in same geographic area covered by the plan at the time the participant commenced benefits…" (181).

In addition, none of the reasons stated for the Trustees interpretation are reasonable.

### (1)  <u>Alleged Longstanding Practice</u>.

The final denial letter states that Wilson McShane staff reviewed Plan records and verified that those who continued working in covered employment past normal retirement age without commencing benefits did not receive a late retirement increase upon their retirement. However, there is no such verification included with the Record, nor is there any indication that a verification was presented to the Board. The Minutes of the Board meeting do not reflect that Wilson McShane participated in any material way. (74). Furthermore, the definition of "Disqualifying Employment" was not added to the Plan until late 2019. (130).

**(2)**     **Inequity Amongst Participants.**

The final determination states that Grandson's interpretation would result in substantially different financial outcomes for similarly situation participants, and that the Plan is "intended to uniformly treat similarly situated participants." The letter does not cite Plan provisions to support this statement, nor does it explain why this reason, even if true, permits the Board to decide contrary to Plan terms.   In any event, Participants whose benefits have been commenced are clearly not similarly situated to participants who have not commenced benefits.  More importantly, the Plan's "Suspension of Benefits" provision applies only if a "Participant has commenced receiving benefit payments." (162).

**(3)**     **Section 3.06(c)(ii) Would be Rendered Meaningless.**

The final determination states that the Plan must be interpreted such that no provision is rendered meaningless. Plaintiff's appeal was based on this principle. His nine-page appeal discussed in detail the relevant provisions of the Plan (definition of Disqualifying Employment, Suspension of Benefits provision, Commencement of Benefits provision). (22-31). The final determination does not address any of these provisions. The Trustees' interpretation renders the "Disqualifying Employment" in Section 3.06(c)(ii) meaningless. If the Plan intended the terms to be interpretated as in 29 C.F.R. § 2530.203-3, it could have easily done so. But the Plan capitalizes the terms and defines it. The Trustees' interpretation also renders the Suspension of Benefits provision meaningless. The Plan uses the terms Disqualifying Employment only regarding the suspension of benefits, and the Suspension of Benefits applies only to a Participant who has commenced benefits. (162).

### (4)    "Disqualifying Employment" Should be Interpreted Based on 29 C.F.R. § 2530.203-3.

The final determination criticizes Grandson for focusing on the terms "Disqualifying Employment," and states that Section 3.06(c)(ii), when read in its entirety, refers to the regulation which contains the broad definition of Section 203(a)(3)(B) service, which Grandson states is missing from Section 3.06(c)(ii).  Defendants' interpretation is so far amiss from a correct grammatical reading of the sentence, it borders the ridiculous. There is no language in that section to indicate that Disqualifying Employment should be interpreted in accordance with the broad definition of Section 203(a)(3)(B) service. There is no indication that the reference to the regulation, 29 C.F.R. § 2530.203-3, is referring to Section 203(a)(3)(B) service. The regulation has several parts and addresses both the situation where a participant's benefits are suspended but not forfeited (§ 2530.203-3(a)) and where a participant's benefits are suspended and forfeited and is working in Section 203(a)(3)(B) service (§ 2530.203-3(b)).  The definition of 203(a)(3)(B) service is in §2530.203-3(c).  The reference in the Plan to the regulation is logically referring to the suspension *rules* in § 2530.203-3(b), since the Plan states the regulation must be satisfied. The Plan clearly states that an actuarial increase is not provided only where 1) the Participant is engaging in Disqualifying Employment; *and* 2) the provisions of the regulation are satisfied.

The Notice Defendants sent to Grandson in November 2019 did not satisfy the provisions of 29 C.F.R. § 2530.203-3, because it did not contain a description of the specific reasons why benefit payments are being suspended, a general description of the plan

provisions relating to the suspension of payments, a copy of such provisions, and a statement to the effect that the applicable Department of Labor regulations can be found in section 2530.203-3. 29 C.F.R. § 2530.203-3(b)(4). Therefore, under the terms of the Plan and the regulations, the Plan cannot deny Grandson an actuarial increase in his benefit.

The *Finley* factors favor Plaintiff. The Trustees' interpretation is not consistent with the goals of the Plan to provide a defined benefit for the exclusive benefit of Participants. (142). ERISA seeks to protect the interests of participants to increase the likelihood that they receive their full benefits. *Skelton v. Radisson Hotel Bloomington,* 33 F.4th 968, 978 (8th Cir. 2022). Defendants' illogical interpretation of section 3.06(c)(ii) of the Plan in isolation is unreasonable. As discussed, the Trustees' interpretation renders several provisions of the Plan meaningless and internally inconsistent. The Trustees' interpretation conflicts with the substantive requirements of ERISA, as ERISA requires a defined benefit plan to actuarially increase a benefit for the delay in receiving the normal retirement benefit unless the Plan provides for a suspension and forfeiture and proper notice is given as permitted under ERISA section 203(a)(3)(B). Defendants have not asserted that the words at issue have been interpreted consistently. The definition of "Disqualifying Employment" was not added to the Plan until 2019, and Grandson did not turn 62 until late 2019, so there was no ability by the Plan to time between the amendment and Grandson's continuing to work beyond normal retirement age to have any consistency. Lastly, and most importantly, as discussed above, the Trustees' interpretation is contrary to the clear language of the Plan.

In summary, the Trustees' interpretation of the Plan is unreasonable on many fronts. Defendants have violated the law by denying Grandson his nonforfeitable pension benefit.

Although unnecessary here, given the Trustees' clear abuse of discretion in interpreting the Plan, the Trustees' conflict of interest and procedural irregularities also support an abuse of discretion finding. Under *Glenn*, the Trustees' conflict is more important, because the circumstances suggest a high likelihood that it affected the benefits decision. *Glenn*, 554 U.S. at 116. The Trustees did not take any steps to eliminate bias and promote accuracy. The Trustees were aware that their attorney had a strong opinion about his prior recommended decision in February 2022.  (1222) In April 2022, prior Counsel sent an email to the Trustees and others, which included the following statement:

> At this time, I doubt he will find an attorney willing to file suit. Although it may not always seem to be the case, attorneys cannot bring utterly meritless cases to court. Mr. Grandson's attorney would need to find some cognizable complaint, such as a procedural violation or an assertion that the decision was substantively wrong. But the decision was correct, and procedure was unambiguously followed.

*(Id.)*. The Trustees were aware that Grandson questioned the soundness of prior Counsel's interpretation if they read his appeal. (23-24, 29).  Grandson made a good point that he believes the Plan professionals thought the Plan was written like 203(a)(3)(B) service, but it is not. (24). Prior Counsel acknowledged in his September 6, 2022 letter to Grandson that it was clear that Grandson had read the Plan and considered it carefully. (31). The Trustees were aware that Grandson felt the Trustees followed Counsel's recommendation without independent analysis. Grandson's letter dated September 13, 2022, states:

> When I asked one of the Trustees if he read and understood my letter, the response I received was "I read it but don't understand all of it." I asked if he had any questions about it, and the response was "no". So that tells me he is waiting for you to give him the answer to what the letter says and means.

(34, 1249-1250). The Trustees should have taken steps to independently ensure that prior Counsel's interpretation of the Plan was correct. After all, it is the Trustees who have the sole discretion to interpret the Plan. A red flag should have gone up when prior Counsel offered to pay for Grandson's attorney in exchange for accepting the Trustees' decision. (1247). Instead, the Record indicates that the Board rubber stamped Counsel's recommendation. (74).

The Board should have known that Grandson was not afforded his rights under the Plan's claims procedures. First, Grandson was blindsided when he was asked to present his questions to the Board in late 2021 and then informed in what was called initially the final determination, that his questions were considered an "appeal" and no further appeals could be raised. (18). Before an appeal can happen, a claim has to be made and the claim denied. (171-172; *see also* 29 C.F.R. § 2560.503-1). Grandson was not told that his questions were even considered a claim. Before an appeal is required, an administrator is required to issue a denial letter that includes certain disclosures to assist the participant in preparing an appeal. (171; 29 C.F.R. § 2560.503-1(g)). This denied Grandson a full and fair review required by ERISA. 29 C.F.R. § 2560.503-1(b)(6).

Then when given a second chance to make things right months later after the Trustees agreed to reconsider Grandson's position, conditions were placed on the reconsideration, limiting Grandson's rights. (31). Grandson was informed that a reconsideration meant that his administrative remedies were not exhausted, but that the deadline for filing a lawsuit did not change. The Plan provides that a lawsuit must be filed within one year after the Board denies an appeal. (172). The February 2022 decision was

superseded by the November 9, 2022, decision, but Grandson was given until only February 10, 2023, to file a lawsuit. (43, 45). Another condition of the reconsideration was that Grandson could not "reassert arguments that were previously addressed" in the February 10 denial letter. (31). The Plan's claims procedures provide that in reviewing an appeal, the Board "will take all comments, documents, records, and other information submitted by the Claimant into account when reviewing the appeal, regardless of whether such information was submitted or considered in the initial benefit determination." (171). ERISA regulations require this for a full and fair review. 29 C.F.R. § 2560.503-1(h)(2)(iv).

The Trustees' procedural errors and conflict of interest are factors that further demonstrate their abuse of discretion. Even if Defendants' interpretation of the Plan were considered a reasonable interpretation, the significant procedural errors limiting Grandson's rights would support a finding that Defendants abused their discretion. *See Chronister v. Unum Life Ins. Co. of Am.*, 563 F.3d 773, 776 (8th Cir. 2009) ("Other evidence also indicates an abuse of discretion … Most egregious is Unum's failure to follow its own claims-handling procedures…").

## C.    <u>Fiduciary Breach Claims</u>.

ERISA contains the express requirement that fiduciaries "discharge [their] duties ... with care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use ...." 29 U.S.C. § 1104(a)(1)(B) (2022). That requirement is further supplemented by the common law of trusts, including the duty of prudence and the duty of loyalty. *See Skelton v. Radisson Hotel Bloomington*, 33 F.4th 968, 976–77 (8th Cir. 2022). ERISA imposes upon fiduciaries

extensive and specific obligations of disclosure. *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009). *Id.* at 598.

ERISA requires plan fiduciaries to act "solely in the interest of the participants and beneficiaries" when administering the plan. 29 U.S.C. § 1104(a)(1) (2022). This is an objective standard that "focuses on the fiduciary's conduct preceding the challenged decision." *Braden,* 588 F.3d at 595. A fiduciary's obligation of loyalty, includes the "obligation to deal fairly and honestly with all plan members." *Kalda v. Sioux Valley Physician Partners, Inc.*, 481 F.3d 639, 644 (8th Cir. 2007). A fiduciary may "not affirmatively miscommunicate or mislead plan participants about material matters regarding their ERISA plan" when discussing a plan. A statement is materially misleading if there is "a substantial likelihood that it would mislead a reasonable employee in the process of making an adequately informed decision regarding ... benefits to which she might be entitled." *Id.*

The evidence demonstrates that Defendants breached their fiduciary duties by misleading Grandson in the SPDs and the Notice of Suspension sent to Grandson in November 2019, by failing to comply with disclosure requirements in the Notice of Suspension, and by failing to conduct adequate investigation and due diligence regarding Grandson's claim.

### (1)    The SPD Misled Grandson.

As part of its disclosure requirements, a plan administrator is required to provide an SPD written in a manner calculated to be understood by the average plan participant that is "sufficiently accurate and comprehensive to reasonably apprise such participants and

beneficiaries of their rights and obligations under the plan." 29 U.S.C. §§ 1022(a), 1024(b). SPDs are to provide a "clear, simple communication" that describes the terms and conditions of the Plan. *Silva v. Metropolitan Life Ins. Co.*, 762 F.3d 711, 721 (8th Cir. 2014), citing *Cigna Corp. v. Amara,* 131 S. Ct. 1866, 1869 (2011). Importantly, an SPD must contain, among other requirements, "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits," 29 U.S.C. § 1022(b).

The 2015 SPD, which was in effect when Grandson turned age 62, explained that the Plan had a Late Retirement Benefit, which permits a participant to *defer* their benefit past normal retirement age. If a participant does not apply to commence benefits by normal retirement age, he will be "deemed to have elected to defer" his benefits. (222). The SPD stated that the amount of the Late Retirement Benefit is "the actuarial equivalent of the normal retirement benefit." (224). Clearly, that statement does not inform Grandson that he would not receive an actuarial adjustment if he continued working. The SPD discusses disqualifying employment, but the heading and text clearly inform the participants that it applies only where a participant retires and begins receiving benefits and then resumes working. (226). Defendants' failure to provide an SPD that clearly explains a participant will suffer a loss of benefits if he continues to work without retiring and commencing benefits is a violation of ERISA and breach of the duty owed to participants.

The 2021 SPD described the amount of the Late Retirement Benefit using the "greater of" language in the Plan but without the specific language Defendants rely upon in their interpretation: "However, no actuarial increase will be provided for months in which a Participant engages in Disqualifying Employment if the provisions of 29 C.F.R. §

2530.203-3 are satisfied." (244). An SPD that leaves out the language the Defendants find most important is clearly deficient. The SPD should have also explained that sentence in a manner to for participants to understand that Disqualifying Employment meant simply continuing to work without first retiring and commencing benefits.

The Trustees' failure to provide an SPD that reasonably apprised Grandson that his Late Retirement Benefit would be reduced by continuing to work violates their duty of prudence. The Trustees' failure to include the language they believe most important also violates their duty of loyalty to deal fairly and honestly with participants. *Skelton*, 33 F.4th at 977.

There are no genuine issues of material fact, because Defendants' breaches are based on the SPDs prepared by them. Grandson is entitled to full recovery for the Trustees' breach of fiduciary duty. *Id.* at 978 (The Eighth Circuit has emphasized that participants should be allowed to seek full recovery for breach of fiduciary duty.). Under the equitable remedy of surcharge or reformation, Grandson should be made whole by receiving a pension benefit that is actuarially adjusted for delayed payment, as represented in the SPD. *Amara*, 563 U.S. at 444. ("It is not difficult to imagine how the failure to provide proper summary information, in violation of the statute, injured employees …").

### (2)    The Suspension of Benefits Notice Was Deficient and Misleading.

As discussed above, the Notice of Suspension of Benefits sent to Grandson in November 2019 did not satisfy the provisions of 29 C.F.R. § 2530.203-3(b)(4), and, therefore, Grandson is entitled to the actuarial equivalent of his Normal Retirement Benefit. To the extent Defendants intended the Notice to suffice as proper notice under the

regulation, they failed in their duty of care and loyalty. The cover letter was deceitful, because it explained that the attached Notice meant that Grandson's benefit was being deferred, not forfeited:

> Are your benefits really being "suspended" at age 62? Suspension (the term the government uses) refers to the fact that, had you actually retired at age 62, you would have been entitled to a benefit at that time period however, since you did not retire, commencement of your benefits will be delayed until you actually retire. In other words, you will not receive any benefits as long as you remain employed, and the benefits you could otherwise have received are considered "suspended."

(1). The letter also states that Grandson was receiving the Notice because government regulations require that all pension plan participants who reach normal retirement age receive the Notice. Clearly, this does not inform Grandson that he was receiving the Notice because he was working in Disqualifying Employment. The letter gives no warning to Grandson that he is about to forfeit benefits. A prudent fiduciary would not send a cover letter that misrepresents the intent of the Notice. A prudent fiduciary would clearly inform the participant that he will lose benefits rather than luring the participant into thinking his benefits are simply being deferred.

In addition, if Defendants intended the Notice to qualify as a notice as required by the Plan and regulations, they failed to comply with the disclosure protections. (2-3). The Notice did not inform Grandson of the Plan rules governing suspension of benefits, as the Plan requires. (108). The Notice did not provide a general description of the Plan provisions relating to the suspension of benefits. Instead, the only reference to Plan provisions was: "However, as provided in Section 1.1 of the Plan, if a participant is employed by a contributing employer after age 62, payment of pension benefits is delayed until the

participants actual retirement date." (2). That statement does not even use the word "suspension," but again misrepresents Defendants' intent by using the word "delayed." The Notice does not mention the terms "Disqualifying Employment" which is necessary before benefits can be permanently suspended. Further, the 2015 Plan does not contain a section 1.1. (78). The Notice also does not inform Grandson of his right to request a review under the Plan's claims procedure, which the regulation requires. 29 C.F.R. § 2530.203-3(b)(4).

Defendants' failure to comply with Plan and ERISA requirements is a violation of their duty of prudence. In fact, Defendants lacked such care that the reference to Section 1.1 of the Plan in the Notice was used for many years.  For example, cover letters and Notices sent in 2012, 2014, 2016, 2017, 2018, are verbatim of the letter and Notice sent to Grandson in 2019, even though the Plan has been amended several times during that period. (259-273). *See* Declaration of Denise Y. Tataryn, Exs. 1-4.  The 2010 Plan that was in effect in 2012 includes section 1.1, but it is the section for all definitions, which does not include Disqualifying Employment is anything regarding suspension of benefits. *Id.*, Ex. 4, pp. 1151-1155.

Defendants' misleading statements that Grandson's benefits were being deferred violated their duty of loyalty. Defendants' misrepresentations led to Grandson continuing to work without knowing that his benefits would be forfeited.

There is no genuine issue of material facts, because the breaches are based on documented evidence by Defendants. Plaintiff is entitled to judgment as a matter of law for Defendants' breaches of fiduciary duty holding Defendants liable for the actuarial equivalent of Grandson's Normal Retirement Benefit for the period after age 62 either

through the remedy of surcharge or reformation of the Plan. *Amara,* 563 U.S. at 442-444; *Skelton,* 33 F.4th at 979 (holding the insurer liable for supplemental life insurance coverage which Plaintiff thought he had).

### (3)    Trustees' Failure to Conduct Adequate Investigation.

Grandson's communications with the Plan and Trustees and his August 2022 appeal notified the Trustees that he disputed prior Counsel's interpretation of the Plan and that he had been misled by the SPD and Notice of Suspension of Benefits. The Record shows that the Trustees did very little to address Grandson's concerns, other than to rubber stamp their attorney's draft letters. The Trustees should have conducted investigation especially considering there had been many Plan changes since 2015.

The Trustees were aware that the definition of "Disqualifying Employment" had just been added to the Plan in 2019 despite the Plan using the terms for several years. *See* Tataryn Dec., Ex. 4*,* p. 001176. The Trustees were also aware that in drafting the amendment, the words "at the time that the Participant commenced benefits" were added by prior Counsel and deleted language that did not include these words. *See* Tataryn Dec., Ex. 5, Counsel's redlined draft. The Trustees were aware there were inconsistencies between the Plan and SPD at the time of the amendment to the Plan in 2019. Minutes of a Board meeting on May 17, 2019, state the Plan's attorney presented the amendment to add "Disqualifying Employment" and that it would be presented at the next Board meeting. *See* Tataryn Dec., Ex. 6. The Trustees also had been informed in late 2018 by prior Counsel that "[b]ecause a suspension of benefits violates ERISA's anti-forfeiture provision unless it satisfies the requirements of the regulation." *See* Tataryn Dec., Ex. 7.

31

Given these changes and particularly knowing that the words "at the time that the Participant commenced benefits" were added to the definition of "Disqualifying Employment," Defendants should have questioned prior Counsel's recommendation that the Plan terms "Disqualifying Employment" should be disregarded from their interpretation of Plan section 3.06(c)(ii) and should have questioned prior Counsel's arguments that benefits did not need to commence in order for forfeiture to occur. The Minutes of the November 2019 Board meeting do not indicate there was any disagreement or questioning of Counsel's reasons for denying Grandson's appeal.

The Trustees' failure to conduct adequate investigation into Grandson's arguments shows a lack of care and interest in ensuring he received the benefit to which he was entitled. They were aware that some of the Trustees had told Grandson they did not understand the Plan. Had the Trustees conducted a full and fair review, they would have understood that Grandson's arguments were at the heart of the recent Plan amendment. Had they read the Plan language, SPD, and Notice of Suspension, they would have realized that Grandson's argument had merit.  If they did not understand the Plan language, they had an obligation to understand it. The Trustees cannot sit back and let their Counsel do all the work and make the decisions. The Trustees are the only individuals with the discretionary authority to interpret the Plan.

A fiduciary is obligated to investigate all decisions that will affect the pension plan and must act in the best interests of the beneficiaries. *Schaefer v. Arkansas Medical Soc.,* 853 F.2d 1487, 1491 (8th Cir. 1988). Defendants' failure to independently investigate Grandson's claim is a violation of the duties owed to Grandson. Had Defendants taken

Grandson's arguments seriously and conducted a meaningful review of the documents, Grandson's claim should have been approved. Grandson has suffered a loss of rights owed to him and, consequently, he has been harmed by having his benefits denied.

There are no material issues in dispute, since the evidence is based on documents produced by Defendants. Grandson is entitled to judgment for surcharge relief in the form of make-whole relief to include the actuarial increase in his benefits and his attorney's fees and costs which he has been forced to incur.

### (4)    Attorney's Fees.

The court has discretion to award a prevailing party attorney's fees and costs under 29 U.S.C. §1132(g). However, the Supreme Court has held that fees should be awarded when there is some success on the merits. *Hardt v. Reliance Standard Life Ins. Co.,* 560 U.S. 242, 245 (2010). "Although there is no presumption for awarding fees, a prevailing ERISA plaintiff rarely fails to receive fees." *Whitehouse v. Unum Life Ins. Co. of Am.*, __ F.Supp.3d __, 2024 WL 1209230 (D. Minn. 2024). If successful, Plaintiff will submit an affidavit supporting his fees and costs.

The Record demonstrates that Grandson took steps to avoid litigation and attorneys' fees. Grandson's counsel also took steps to avoid litigation by sending a letter to the Plan's prior Counsel and pointing out the procedural errors. *See* Tataryn Dec., Ex. 8.

### CONCLUSION

Plaintiff has demonstrated that he is entitled to judgment on his benefits due claim and fiduciary breach claims, and there are no material issues in dispute. Therefore, Plaintiff

respectfully requests the Court to grant summary judgment in his favor.

Dated:   08/30/2024               **NOLAN, THOMPSON, LEIGHTON
                                   & TATARYN, PLC**

                                  By   /s/ *Denise Y. Tataryn*
                                       Denise Y. Tataryn (#179127)
                                  1011 1st Street South, Suite 410
                                  Hopkins, MN  55343
                                  Phone:  952-405-7171
                                  Email:  dtataryn@nmtlaw.com

                                  ***Attorney for Plaintiff***