# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

James Grandson,

                     Plaintiff,

v.

Western Lake Superior Piping Industry Pension Plan and Board of Trustees of the Western Lake Superior Piping Industry Pension Plan,

                     Defendants.

Case No. 0:23-cv-00214-JMB-LIB

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff seeks an "actuarial increase" to his pension benefits that neither ERISA nor the express terms of his pension plan permits. Plaintiff asserts two substantive claims in his Amended Complaint ("Complaint"): (i) Quasi-declaratory relief under 29 U.S.C. §1132(a)(1)(B); and (ii) Breach of fiduciary duty under §1132(a)(3).[1] To support his claims, Plaintiff sidesteps readily available evidence and instead cobbles together bits and pieces of the plan documents and communications to argue that his circumstance (which is nothing more than ongoing employment after he became age-eligible for retirement) is not contemplated by the plan and therefore by default, he is entitled to an actuarial increase of his benefits. Plaintiff is wrong.

---

[1] Count Three seeks attorneys' fees.

From the day he was age-eligible for retirement, Plaintiff elected to continue working at a job he had been working at for years. The plan document provided that under that circumstance, a participant's benefits are suspended until the participant retires and discontinues work in covered employment. Shortly before Plaintiff became age-eligible for retirement – in November 2019 – he was notified in writing that his benefits were "suspended," that "[b]enefit payments that are not made to you during your period of employment after age 62 are being permanently withheld and forfeited," that "your Plan benefit will be based on the total months of pay and service at your actual retirement," and that he could have "the suspension of your benefits" reviewed. Rather than accept exactly what he knew in 2019, Plaintiff inexplicably waited almost two years to claim that the November 2019 suspension was wrong.

Knowing that his claim for additional benefits is unfounded, Plaintiff also seeks an actuarial increase of his benefits purportedly due to the Trustees breaching their fiduciary duty to him providing a deficient suspension notice, by providing a misleading summary plan description ("SPD"), and incredibly, by relying on the advice of counsel. This is just another strained attempt to recover benefits to which Plaintiff is not entitled.

The undisputed material facts, taken in the light most favorable to Plaintiff, do not give rise to a claim under ERISA or the plan. Plaintiff failed to seek timely review of his benefits suspension, thereby failing to exhaust his administrative remedies before filing this lawsuit. Moreover, the Trustees' decision that Plaintiff is not entitled to an actuarial increase was reasonable and is therefore entitled to deference by this Court. Finally, Defendants did not breach their fiduciary duties to Plaintiff. The hyper-technical

deficiencies cited by Plaintiff do not create a claim where none exists. The plan documents and communications were not materially misleading and in any event, Plaintiff did not rely on them to his detriment. Finally, Plaintiff's suggestion that the Trustees breached their fiduciary duties by relying on their attorney is contrary to applicable law.

## UNDISPUTED FACTS

### The Plan Documents

1.    Plaintiff is a participant in the Western Lake Superior Piping Industry Pension Plan ("Plan"). ECF 41, ¶5; ECF 42, ¶5.

2.    The Duluth-based Plan is a multiemployer defined benefit pension plan established in 1968 by the Plumbers & Pipefitters United Association Local 11 ("Local 11") and the Northern Mechanical Plumbing Contractors Association, Inc. ECF 41, ¶6; ECF 42, ¶6.

3.    The Board of Trustees ("Trustees") of the Plan is the Plan Administrator. A.R.114.[2]

4.    The Trustees operate pursuant to a written governing document initially created in 1968 and periodically restated, most recently in 2015 ("2015 Restatement") and 2020 ("2020 Restatement"). A.R.77, 142.

5.    Plaintiff's claims are based on the terms of the 2015 and 2020 Restatements. ECF 41 ¶¶8-23.

---

[2] "A.R." refers to the Administrative Record, which is attached to the Declaration of Stacey Drentlaw ("Drentlaw Dec.") as Exhibit A.

6.     Both Restatements grant the Trustees discretionary authority to make benefit determinations:

> … [T]he Board of Trustees has complete control of the administration of the Plan. The Board of Trustees has all the powers necessary for it to properly carry out its administrative duties … the Board of Trustees has the power and discretion to construe the Plan and to determine all questions that may arise under the Plan, including all questions relating to the eligibility of Employees to participate in the Plan, the amount of benefit to which any Participant … may become entitled.

A.R.114 (§9.01); A.R.169 (§4.16).

7.     The Plan's "Normal Retirement Age" ("NRA") is 62. A.R.87 (§1.33); A.R.186 (§5.34).

8.     The Plan provides for a Late Retirement Benefit as follows:

> A participant's retirement benefit on a Late Retirement Date shall be equal to the greater of (i) or (ii) below:
>
> (i)     The Accrued Benefit on the Late Retirement Date.
>
> (ii)    The Actuarial Equivalent of the Normal Form on the Normal Retirement Date. *However, no actuarial increase will be provided for months in which a Participant engages in Disqualifying Employment if the provisions of 29 C.F.R. §2530.203-3 are satisfied.*

A.R.22 (§4.04(c)); A.R.153 (§3.06(c))(emphasis added).

9.     29 C.F.R. §2530.203-3, which Section 4.04(c) of the 2015 Restatement incorporates by reference, governs "suspension of pension benefits upon employment" and expressly includes the "employment of an employee subsequent to the time the payment of benefits commenced or *would have commenced if the employee had not remained in* or returned to employment" if the employment meets certain criteria. 29 C.F.R. §2530.203-

3(c)(2)(emphasis added). Section 3.06(c) of the 2020 Restatement likewise incorporates §2530.203-3(c)(2). A.R.153.

10.     The Plan defines Disqualifying Employment as:

Forty (40) or more hours of employment in same industry covered by the plan, in same geographic area covered by the plan at the time that the participant commenced benefits, and in the same trade or craft that the participant was employed in at any time under the plan. …

A.R.131 (§1.14, as amended May 1, 2019); A.R.181 (§5.15).

11.     The Plan provides that "[i]f a Participant has commenced receiving benefit payments, the Participant's monthly benefit will be permanently suspended for each month in which the Participant works in Disqualifying Employment…" A.R.107 (§6.07(a)); A.R.162 (§4.08(a)).

12.     If a Participant's benefits are suspended, he/she has 60 days to seek review:

A Participant shall be entitled to a review of the determination suspending his benefits by written request filed with the Trustees within 60 days of the notice of suspension. … Such review under this section shall be in accordance and pursuant to Article 9 of this Plan.

A.R.108 (§6.07(f)).

13.     The Plan was restated effective August 31, 2020 to among other things add a Variable Annuity Program ("VAP") which would apply to benefits accrued beginning January 1, 2021. *See* A.R.146-150 (Articles 1-2 of 2020 Restatement). Benefits accrued prior to December 31, 2020 are part of the Defined Benefits Program. A.R.146, 159 (Articles 1 and 3 of 2020 Restatement).

14. The Restatements were summarized in SPDs issued in 2015 and 2021. The SPDs advise participants that the SPDs are only a summary and that benefits are determined by the Plan Document:

> As you get closer to retirement, you may want more specific information about the amount of your benefit and the options available to you. This SPD is effective as of January 1, 2015, and *is intended to give you a summary of the major features of the Plan. However, your benefits are determined by the Plan, not this SPD.* You may obtain a copy of the Plan by contacting the Third Party Administer at (218) 728-4231.

A.R.218 (emphasis added). *See also* A.R.236.

15. Plaintiff received and read the SPDs. Drentlaw Dec. at Ex. B (Grandson Dep.) at 27:6-28:9; 50:8-51:11.

16. Plaintiff did not change his retirement plans after reading the SPDs. *Id.* at 28:10-12; 51: 12-14.[3]

17. Plaintiff's original plan was to retire when he reached the Plan's NRA of 62. *Id.* at 27:19-22. After reading the 2015 SPD, Plaintiff still intended to retire at age 62. *Id.* at 28:7-12. The "main reason" Plaintiff decided to work past age 62 was a conversation with Scott Torvinen, a co-worker (who was also a Trustee) in which he was told that there would be an increase in service credit value. *Id.* at 33:11-34:4. Plaintiff also suggested that his belief that he would receive an actuarial increase to his benefits also played into his decision, but the "main reason" he worked past NRA was the potential service credit

---

[3] An SPD was also issued in 2020. Drentlaw Dec. at Ex. C. Plaintiff received and read the 2020 SPD, and nothing in it changed his retirement plans. *Id.* at 31:12-33:8.

increase. *Id.; See also id.* at 35:17-36:16. In January 2021, after the VAP was adopted, Plaintiff decided he would retire in May 2021. *Id.* at 47:12-21. After Plaintiff announced his retirement plan, Scott Torvinen asked him to continue working to finish a specific project, which Plaintiff agreed to do because he felt sorry for Scott and because of the actuarial increase he understood he would receive. *Id.* at 48:17-23; 49:12-50:5. Plaintiff continued working after he was informed by the Third Party Administrator ("TPA") that he would not receive an actuarial increase in the fall of 2021 because of his agreement to complete the project. *Id.* at 55:19-56:3.

**Plaintiff's Work in Disqualifying Employment Past NRA**

18.    Plaintiff was born on December 13, 1957 (A.R.53) and would turn 62 (NRA) on December 13, 2019.

19.    Because Plaintiff was nearing age 62 and had not filed a retirement application, the Plan's TPA mailed Plaintiff a letter dated November 1, 2019 ("Suspension Letter"), advising Plaintiff that as long as he continued to work he would not receive retirement benefits. A.R.1, 36.

20.    The Suspension Letter specifically provided: "As long as you are working, you will continue to accumulate benefits under the plan. When you retire, your benefits will be based on your plan service record at your actual age." A.R.1. It also explained:

> Are your benefits really being 'suspended' at age 62? Suspension (the term the government uses) refers to the fact that, had you actually retired at age 62, you would have been entitled to a benefit at that time. However, since you did not retire, commencement of your benefits will be delayed until you actually retire. In other words, you will not receive any benefits as long as you remain employed, and the benefits you could otherwise have received are considered 'suspended'.

*Id.*

21.    The Suspension Letter enclosed a separate Notice of Suspension of Retirement Benefits ("Suspension Notice")(A.R.2-3) which advised that the Plan's NRA was 62:

> and upon retirement at that age, benefit payments ordinarily begin. However, as provided in Section 1.1[4] of the Plan, if a participant is employed by a contributing employer after age 62, payment of pension benefits is delayed until the participant's actual retirement date. *Benefit payments that are not made to you during your period of employment after age 62 are being permanently withheld and forfeited.* However, *when you ultimately retire from covered employment, your Plan benefit will be based on the total months of pay and service at your actual retirement age.*

A.R.2 (emphasis added). The Suspension Notice further advised that additional information about "the suspension of pension benefits payments" is available at §2530.203-3 and advised that review of the benefits suspension could be obtained. *Id.*

22.    Plaintiff received the Suspension Letter and the Suspension Notice in November 2019, before turning 62. ECF 41, ¶29; ECF 42, ¶29; A.R.1-3, 53.

23.    Plaintiff read the Suspension Letter and the Suspension Notice. Drentlaw Dec. at Ex. B at 36:24-37:7; 39:10-13.

24.    Plaintiff knew what a contributing employer was, knew that Jamar (his employer) was a contributing employer, knew that he could not collect his pension while working at Jamar, and continued working there after NRA. *Id.* at 40:1-10:15.

---

[4] The Suspension Notice contains a typographical error which resulted in the Suspension Notice referencing Section 1.1 rather than Section 1.14. A.R.2. However, *the language* in the Suspension Notice is consistent with Section 1.14. A.R.5-6  (§1.14).

25.     Plaintiff did not change his retirement plans based on the Suspension Letter and Suspension Notice. *Id.* at 44:5-12.

26.     After receiving the Suspension Notice, Plaintiff did not advise the Plan or TPA that he disagreed with the benefits suspension nor did he seek review within sixty days. *Id.* at 43:8-16.

**Plaintiff's Claim for Benefits**

27.     In the months leading up to November 2021, almost two years after receiving the November 1, 2019 Suspension Notice, Plaintiff contacted the TPA and Local 11 with questions about how his retirement benefit would be calculated. A.R.4; 59.

28.     At their November 8, 2021 Board meeting, the Trustees discussed that Plaintiff had posed several questions about his benefits calculation and that Plaintiff had not been satisfied with the TPA's answers. The Trustees consented to having the TPA send a communication to Plaintiff asking him to submit his questions in writing so that Plan Counsel could review them and provide a written response in advance of their next meeting. A.R.4, 59.

29.     On January 13, 2021, Plaintiff sent a letter in which he admitted his "retirement benefit was suspended two years ago when [he] continued to work past the normal retirement age of 62," but claimed that "based on the SPD and the Plan, [he] should be entitled to the actuarial equivalent of his normal retirement benefit at his late retirement date." Plaintiff acknowledged that the TPA had advised him that under Section 3.06, "no actuarial increase will be provided for months in which a participant 'engages in Disqualifying Employment if the provisions of 29 C.F.R. §2530.203-3 are satisfied'" but

claimed that those provisions were not satisfied and that not providing him with an actuarial increase would violate §2530.203-3. A.R.5.

30.     The Trustees discussed Plaintiff's letter at their February 9, 2022 meeting, with Plan Counsel advising that Plaintiff's letter should be treated as an appeal. A draft response with details on why Plaintiff's interpretation of the Plan Document, ERISA, and federal regulations was mistaken was reviewed with the Trustees. After discussion regarding Plaintiff's letter and Plan Counsel's draft response, the Trustees resolved to deny Plaintiff's appeal based on the Plan language and approved having Plan Counsel send a letter denying the appeal. A.R.63-64. The letter was sent on February 10, 2022. A.R.18-20.

31.     The letter advised:

… the Board examined the timeliness of your appeal. To the extent that it pertains to a suspension of benefits that commenced two years ago, the appeal is untimely. … However, the gravamen of your appeal is that the Plan contains a term that violates applicable law. Because this is purely a legal question, the Board determined that your appeal can be decided on its merits …

A.R.18-20.

32.     Regarding Plaintiff's request for an actuarial increase, the letter said:

Your request for an actuarial increase in your benefit is contrary to the terms of the Plan. Your argument that the Plan violates the suspension of benefit regulation is not correct. Under an accurate reading of applicable law, Section 3.06(c)(ii) of the Plan is permissible. *See* 26 C.F.R. 1.411(c)-1(f)(2). ERISA Section 404(a) requires the Trustees to enforce all legally permissible terms of the Plan. Consequently, the Board determined that when you cease working in disqualifying employment the Plan will not provide an actuarial increase in your benefit payment on account of the suspension of your normal retirement benefit.

*Id.*

33.    On August 8, 2022, Plaintiff sent an eight-page letter seeking reconsideration. A.R.22-29.

34.    During the Trustees' August 30, 2022 Board meeting, the Trustees asked Plan Counsel to review Plaintiff's letter and advise how to proceed. Plan Counsel advised that Plaintiff had raised several new claims that could warrant a response, and recommended that he be permitted to draft a letter to Plaintiff in order to "seek a last and final letter" as a "final appeal" of Plaintiff's benefit calculation. The Trustees discussed Plaintiff's letter and found that it "may be in the best interest of [Plaintiff] and the Board to permit this final communication" and authorized Plan Counsel to draft a letter. A.R.67-68.

35.    On September 2, 2022, Plaintiff submitted an Application for Retirement Benefits in which he admitted to working at Jamar from March 2010 to "present," nearly three years after the Plan's NRA (62). A.R.46.

36.    On September 6, 2022, Plan Counsel advised Plaintiff he could advance new arguments relating to his position. A.R.30-32.

37.    On September 7, 2022, Plan Counsel spoke with Plaintiff on the phone, the substance of which was confirmed by email. The discussion included an offer by Plan Counsel to explore the possibility of the Plan paying for a reasonably priced attorney of Plaintiff's choice to represent him with respect to his questions. Plan Counsel requested that Plaintiff notify him by September 16, 2022 if he would like to initiate reconsideration

of his appeal and to let him know as soon as possible if he wanted Plan Counsel to look into the possibility of the Plan providing an attorney to represent Plaintiff. A.R.33.

38.    On September 13, 3022, Plaintiff advised that he did not want an attorney, he did not intend to submit additional materials, and he agreed to wait until November 11, 2022, after the Trustees' November 8, 2022 meeting, to decide when to retire. A.R.34.

39.    On September 15, 2022, Plan Counsel advised that he interpreted Plaintiff's correspondence as requesting reconsideration and that he would notify Plaintiff of the Trustees' decision. A.R.35.

40.    On October 20, 2022, the TPA provided to Plan Counsel a summary of how late retirement benefits are calculated:

> If a Participant has stopped working in disqualifying employment at or before NRA, and just waited to start collecting, they would get an actuarial increase to their total pension benefit. If they continued to work in disqualifying employment after NRA they would get all years and hours at the age of retirement (no actuarial increase). If a Participant works less than 40 hours in a month in disqualifying employment after NRA, they would receive an actuarial adjustment for just the months they worked under 40 hours.

A.R.36.

41.    The TPA also reviewed Plan records and verified that participants who continued working in Disqualifying Employment past NRA without commencing benefits did not receive a late retirement increase when they retired. Declaration of Robert Doblar ("Doblar Dec.") ¶¶5-13. As part of the record review performed in fall 2022, the TPA identified six late retirees who retired between 2015 and 2022 who continued working in Disqualifying Employment after NRA without commencing benefits, and were not given an actuarial increase. *Id.* ¶11. The TPA also identified two late retirees who received partial

actuarial increases because they had worked for more than forty hours in Disqualifying Employment during some months and thus, did not receive an actuarial increase for those months, and one late retiree who received a partial actuarial increase because a Suspension Notice had not been sent to him until a year after he reached NRA. *Id.* ¶¶12-13.[5]

42.    On November 8, 2022, the Trustees reconsidered Plaintiff's appeal. As part of the reconsideration process, Plan Counsel provided a recommendation that Plaintiff's request for reconsideration be denied with respect to benefits accrued prior to December 31, 2020 as part of the Defined Benefit Program and that reconsideration be granted with respect to benefits accrued beginning January 1, 2021 under the VAP. A.R.41-42.

43.    Plan Counsel provided the following in support of his recommendation:

> When a plan participant is eligible for normal retirement benefits but defers them, the Plan must actuarially increase the participant's benefit payments to account for paying benefits over a compressed period. But the Plan is not required to increase the benefit payment of a participant who continues working past [NRA], because that participant is not retired. The participant did not defer benefits he was otherwise eligible to receive; he was not entitled to benefits while he continued working. He is not entitled to benefits until he retires. Regulations provide an example: if a plan with a normal retirement

---

[5] During discovery, the TPA conducted an additional review of late retiree files spanning from 2007 through 2024. Doblar Dec. ¶14. This review identified 53 late retirements as follows: 20 late retirees who stopped working in Disqualifying Employment but did not immediately apply for retirement benefits; 16 late retirees who continued working in Disqualifying Employment for more than forty hours per month and did not receive an actuarial increase; five late retirees who intermittently worked in Disqualifying Employment and received a partial actuarial increase; and one late retiree who received a partial actuarial increase because he was not sent a Suspension Notice until one year after reaching NRA. *Id.* ¶¶16-20. The TPA also identified eleven late retirees who continued working in Disqualifying Employment but were not sent Suspension Notices. Because Suspension Notices were not sent, an actuarial increase was provided to those retirees. *Id.* at 19.

age of 65 provides a benefit of $400 a month payable at age 65, the same $400 benefit (with no upward adjustment) could be paid to an employee who retires at age 68.

A.R.41-42.

44.    Plan Counsel explained:

Your legacy Plan[6] reflects the notion that there is no need to actuarially increase benefits for those who work past [NRA]. Section 3.06(c)(ii) states that "no late retirement actuarial increase will be provided for months in which a participant engages in Disqualifying Employment if the provisions of 29 C.F.R. §2530.203-3 are satisfied." [Plaintiff] argues that, because an element of the definition of "Disqualifying Employment" is defined within the Plan by reference to the time at which benefits commence, a participant must first commence benefits before he can work in Disqualifying Employment. [Plaintiff] had not commenced benefits before the period on which he demands a late retirement increase. He contends, therefore, that his continuous work in covered employment for contributing employers after [NRA] does not invoke Section 3.06(c)(ii). This is a faulty reading of the Section. [Plaintiff] found what he thinks is a minor technical flaw in the Plan. But he ignores the language in Section 3.06(c)(ii) that refers to the underlying regulation, paving over any ambiguities.

A.R.42.

45.    Plan Counsel advised Plaintiff's interpretation would render Section 3.06(c)(ii) meaningless because under Plaintiff's reading, Section 3.06(c)(ii) would

mean that those who *have commenced* benefits and then work in covered employment are not entitled to late retirement increases. That is nonsensical. Only those who *have not commenced* benefits can receive a late retirement increase. It would be absurd for Section 3.06(c)(ii) to exist solely to state an obvious fact that adds nothing to the Plan. In contrast, if those who have not commenced benefits can work in Disqualifying Employment, as that term is used within the Section, then Section 3.06(c)(ii) means that those participants who work past [NRA] in covered employment are not entitled to a late retirement increase. That interpretation is consistent with the law, it is appropriate in context, and it adds meaning to the Plan.

---

[6] "Legacy Plan" refers to the Defined Benefit Program.

14

*Id.*

46.    Plan Counsel noted that interpreting Section 3.06(c)(ii) to mean that Plaintiff was not entitled to an actuarial increase due to his continued work in covered employment would be "consistent with the Plan's longstanding practice, confirmed with [the TPA], of denying late retirement increases to participants who work in covered employment past [NRA]." *Id.[7]*

47.    With respect to the calculation of Plaintiff's benefits that had accrued beginning January 1, 2021 under the VAP, Plan Counsel recommended that the Trustees approve Plaintiff's request for reconsideration because Plaintiff was correct that "the Plan does not contain language excepting those who work past normal retirement age from late requirement increases" due to an "oversight." A.R.42.

48.    After discussing Plaintiff's request for reconsideration, including Plan Counsel's recommendations, the Trustees voted to approve Plaintiff's appeal as it related to the VAP because there had been an oversight in including the necessary language in the VAP portion of the Plan Document. A.R.74.

49.    The Trustees voted to deny Plaintiff's appeal as it related to the Legacy Plan (Defined Benefit Program). *Id.*

50.    On November 9, 2022 Plan Counsel notified Plaintiff of the Trustees' decision:

---

[7] As stated in Paragraph 41, the TPA reviewed late retiree files to confirm that longstanding practice.

On reconsideration, the Board reversed its prior decision in part and affirmed it in part. The Board concurred with your argument that you are entitled to a late retirement increase with respect to your benefits accrued to date under the [VAP]. Your benefits will be administered accordingly. For the reasons set forth below, the Board held that you are not entitled to a late retirement increase with respect to your benefits accrued under the Defined Benefit Program.

A.R.43.

51.    Fund Counsel outlined the following reasons for the Trustees' decision to deny Plaintiff's request for a late retirement increase under the Defined Benefit Program:

1.    Your interpretation is contrary to the meaning of the Plan established by longstanding practice. Wilson McShane staff reviewed plan records and verified that those who continued working in covered employment past [NRA] age without commencing benefits did not receive a late retirement increase upon their eventual retirement.

2.    Your interpretation would result in substantially different financial outcomes for similarly situated participants. Two participants attain [NRA]. One retires then immediately returns to work. The other simply works past [NRA]. The participant who drew a pension and then returned to work would not receive a late retirement increase. Applying your interpretation, the other participant would receive a late retirement increase. But both participants worked continuously in covered employment past normal retirement age. … The Plan is intended to uniformly treat similarly situated participants. Your interpretation is inconsistent with that intent.

3.    … If we interpret Section 3.06(c)(ii) as you assert, it would apply only to those who have commenced benefits. That class of participants can never be eligible for a late retirement increase. Thus, Section 3.06(c)(ii) would not apply to you, or anyone else, ever. It would be meaningless surplusage. In contrast, if Section 3.06(c)(ii) applies to those who have not commenced benefits, its meaning is appropriate in context, consistent with longstanding practice, and in accord with Treasury Regulations (26 C.F.R. 1.41(c)-1(f)(2))[8].

_____

[8] "No actuarial adjustment to an accrued benefit is required on account of employment after normal retirement age. For example, if a plan with a normal retirement age of 65 provides

16

4.      Your interpretation ignores a portion of the relevant text of Section 3.06(c)(ii). You focus on the term "Disqualifying Employment". Section 3.06(c)(ii), when read in its entirety, expressly refers to 29 C.F.R. §2530.203-3. That regulation contains a broad definition of section 203(a)(3)(B) service that you contend is missing from Section 3.06(c)(ii).

A.R.44.

52.      On December 2, 2022, Plaintiff confirmed his request that the TPA disregard his retirement application. A.R.54.

## ARGUMENT

Plaintiff's Complaint includes two substantive causes of action. Count One seeks a judgment under §1132(a)(1)(B) clarifying that when he retires, he is entitled to an actuarial increase to his pension benefits.[9] Count One fails because Plaintiff failed to seek timely review of his suspension and regardless, the Trustees' determination that Plaintiff is not entitled to an actuarial increase was not an abuse of discretion. Count Two, which seeks equitable relief under §1132(a)(3) for alleged fiduciary breaches, should likewise be dismissed because technical deficiencies in the Suspension Notice cannot create a claim where none exists, the communications and SPDs were not materially misleading and Plaintiff did not reasonably rely on them, and relying on advice of legal counsel cannot constitute a fiduciary breach.

---

a benefit of $400 a month payable at age 65 the same $400 benefit (with no upward adjustment) could be paid to an employee who retires at age 68."

[9] Defendants do not dispute that Plaintiff is entitled to an actuarial increase for any benefits accrued under the VAP. Only Plaintiff's rights under the Defined Benefit Program are in dispute.

## I.    PLAINTIFF'S CLAIM WAS NOT TIMELY.

### A.    *Summary judgment standard.*

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A court considering a summary judgment motion must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is appropriate if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof a trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). "To defeat a motion for summary judgment, a party must not rest upon allegations, but must produce probative evidence sufficient to demonstrate a genuine issue [of material fact] for trial." *Davenport v. Univ. of Ark. Bd. of Trs.*, 553 F.3d 1110, 1113 (8th Cir. 2009).

### B.    *Plaintiff did not timely seek review of his benefits suspension.*

"Exhaustion of contractual remedies is required in the context of a denial of benefits action under ERISA when there is available to a claimant a contractual review procedure that is in compliance with 29 U.S.C. §1133 and 29 C.F.R. §2560.501-1(f) and (g)." *Wert v. Liberty Life Assurance Co. of Boston*, 447 F.3d 1060, 1063 (8th Cir. 2006). "[W]hether it is a denial letter or a plan document that uses permissive language to describe a review process, 'claimants with notice of an available review procedure should know that they must take advantage of that procedure if they wish to bring wrongful benefit denial claims

to court.'" *Id.* at 1066 (quoting *Kinkead v. SW Bell Corp. Sickness & Accident Disability Benefit Plan*, 111 F.3d 67, 69 (8th Cir. 1997)). In *Kinkead*, a district court's dismissal of an action brought pursuant to §1132(a)(1)(B) was affirmed because the plaintiff had not sought review of the adverse benefits determination. *Kinkead*, 111 F.3d at 68. Here, Defendants are entitled to summary judgment because Plaintiff failed to exhaust his contractual remedies by filing a written request for review of the Suspension Notice within 60 days.

Plaintiff received the Suspension Notice in November 2019. A.R.1-3. *See also* ECF 41, ¶29; ECF 42, ¶29. The Suspension Notice advised that "[b]enefit payments that are not made to you during your period of employment after age 62 are being permanently withheld and forfeited," when "you ultimately retire from covered employment, your Plan benefit will be based on the total months of pay and service at your actual retirement date," and review of the benefit suspension was available. A.R.2-3. Plaintiff was clearly advised that his retirement benefits were being *suspended* because he continued to be employed by a contributing employer, that benefits would not commence until he retired from covered employment, and that review of the benefits suspension was available. A.R.1-3.

Section 6.07 of the 2015 Restatement (in effect when Plaintiff received the Suspension Notice) addresses "Suspensions of Benefits" and outlines the process by which a participant can have a benefits suspension reviewed:

    (f)   <u>Review</u>

        A Participant shall be entitled to a review of the determination suspending his benefits by written request filed with the Trustees

> *within 60 days of the notice of suspension.* … Such review under this section shall be in accordance and pursuant to Article 9 of the Plan.

A.R.108 (§6.07(f))(emphasis added). Article 9 of the 2015 Restatement outlines the process to be followed by participants to obtain review of adverse benefit determinations. A.R.115-116. If Plaintiff wanted review of his benefits suspension, he was required to file a written request within 60 days of receiving the Suspension Notice (*i.e.* by January 1, 2020). A.R.108 (§6.07(f)). *See also* A.R.226. Plaintiff did not advise the Plan or TPA that he disagreed with the suspension of his benefits and did not seek a review of his benefits suspension within sixty days. Indeed he did not seek review until mid-2021, nearly two years later than permitted. There are no exceptions to this general rule and Plaintiff has no valid excuse for not timely raising the issue. Because Plaintiff failed to exhaust his contractual remedies in a timely manner, Defendants are entitled summary judgment.

## II.    THE TRUSTEES' REASONABLE DECISION SHOULD BE UPHELD.

Even if Plaintiff had timely sought review of the Suspension Notice, he would not be entitled to an actuarial increase. The Trustees' determination that the Plan does not provide for an actuarial increase if an employee continues to work in Disqualifying Employment after reaching NRA was reasonable and is thus entitled to deference by this Court.

### A.    *The Trustees' benefit determination is entitled to deference.*

The 2020 Restatement (in effect when the Trustees decided Plaintiff was not entitled to an actuarial increase) gives the Trustees the power and discretionary authority to determine eligibility for benefits and to construe the terms of the Plan:

> … the Board of Trustees has the power and discretion to construe the Plan
> and to determine all questions that may arise under the Plan, including all
> questions relating to the eligibility of Employees to participate in the Plan,
> the amount of benefit to which any Participant … may become entitled.

A.R.169 (§4.16). Where a plan gives the administrator[10] "discretionary authority to determine eligibility for benefits or to construe terms of the plan," the administrator's decision is reviewed for an abuse of discretion. *Ruessler v. Boilermaker-Blacksmith Nat'l Pension Trust Board of Trustees,* 64 F. 4th 951, 957 (8th Cir. 2023) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)); *Green v. Union Sec. Ins. Co.*, 646 F.3d 1042, 1050 (8th Cir. 2011)("Where an ERISA plan grants the administrator discretion to determine eligibility for benefits and to interpret the plan's terms, courts must apply a deferential abuse-of-discretion standard of review.")

Under the abuse of discretion standard, "the administrator's decision should be affirmed if it is reasonable, meaning it is supported by substantial evidence." *Id.* at 1050 (citations omitted). "Substantial evidence is more than a scintilla but less than a preponderance." *Id.* (citing *Midgett v. Wash. Group Int'l Long Term Disability Plan*, 561 F.3d 887, 893 (8th Cir 2009). "A court is not to substitute its own judgment for that of the plan administrator." *Alexander v. Trane Co.*, 453 F.3d 1027, 1031 (8th Cir. 2006). The court must determine whether a "reasonable person *could* have reached a similar decision, given the evidence before him, not [whether] a reasonable person *would* have reached that decision." *Prezioso v. Prudential Ins. Co. of Am.*, 748 F.3d 797, 805 (8th Cir. 2014).

---

[10] The Board of Trustees is the Plan Administrator. A.R.114.

"Where a plan fiduciary offered a reasonable interpretation of a disputed plan provision, 'courts may not replace it with an interpretation of their own – and therefore cannot disturb as an 'abuse of discretion' the challenged benefits determination.'" *Ingram v. Terminal R.R. Ass'n of St. Louis Pension Plan for Nonschedule Workers,* 812 F.3d 628, 634 (8th Cir. 2016)(quoting *King v. Hartford Life & Accident Ins. Co.*, 414 F.3d 994, 999 (8th Cir. 2005)).

In assessing the reasonableness of an administrator's plan interpretation, the court considers five factors: "(1) whether the interpretation is consistent with the goals of the plan; (2) whether it renders any language in the plan meaningless or inconsistent; (3) whether it conflicts with the requirements of ERISA; (4) whether the administrator has interpreted the words at issue consistently; and (5) whether the interpretation is contrary to the clear language of the plan." *Brake v. Hutchinson Tech., Inc.,* 774 F.3d 1193, 1197 (8th Cir. 2014). *See also Finley v. Special Agents Mut. Benefit Ass'n*, 957 F.2d 617, 621 (8th Cir. 1992). In this case, Defendants are entitled to summary judgment because the Trustees' determination that Plaintiff was not entitled to an actuarial increase was reasonable.

### 1. *The decision is reasonable because it is consistent with longstanding practice.*

The Trustees' decision that Plaintiff was not entitled to an actuarial increase due to his continued work at a contributing employer after NRA without commencing benefits was consistent with longstanding practice. A.R.42; 44. During the fall of 2022, the TPA provided an overview regarding how late retirement benefits are calculated:

> if a Participant has stopped working in disqualifying employment at or before NRA, and just waited to start collecting, they would get an actuarial increase

> to their total pension benefit. If they continued to work in disqualifying employment after NRA they would get all years and hours at the age of retirement (no actuarial increase). If a Participant works less than 40 hours in a month in disqualifying employment after NRA, they would receive an actuarial adjustment for just the months they worked under 40 hours.

A.R.36.

The TPA also reviewed Plan records for 2015 through November 2022 to verify the Plan's longstanding practice of not providing actuarial increases to those participants who continued working in Disqualifying Employment after NRA. *See* Doblar Dec. ¶¶5-15. Between 2015 and November 2022, there were 33 late retirees, many of whom stopped working in covered employment at NRA but did not immediately apply for retirement benefits, and therefore received an actuarial increase. *Id.* ¶13. Six late retirees continued working in covered employment and did not receive an actuarial increase when they retired. *Id.* ¶14. Two others received partial actuarial increases because they had worked more than 40 hours in Disqualifying Employment during some, but not all, months after NRA, and one late retiree received a partial actuarial increase because he was not sent a Suspension Notice until a year after reaching NRA. *Id.* ¶15. During the summer of 2024, the TPA reviewed additional late retiree files for 2007 through 2024. *Id.* ¶¶16-21. That review further confirmed the longstanding practice of not providing actuarial increases to late retirees who continued working in Disqualifying Employment after NRA:

| # of Late Retirees | Details re: Work After NRA | Actuarial Increase? |
|---|---|---|
| 53 | All late retirees (2007-2024) | |
| 20 | Late retirees who stopped working in Disqualifying Employment at NRA | Received actuarial increase |

| 16 | Late retirees who continued working in Disqualifying Employment after NRA | No actuarial increase |
|---|---|---|
| 5 | Late retirees who continued working in Disqualifying Employment for more than 40 hours in some, but not all, months | Partial actuarial increase |
| 1 | Late retirees to continued working in Disqualifying Employment after NRA but was sent Suspension Notice late | Partial actuarial increase |
| 11 | Late retirees who were not sent Suspension Notices, continued to work in Disqualifying Employment after NRA | Received actuarial increase |

*Id.* ¶¶16-21. The Court can consider evidence outside the administrative record to determine if a plan provision has been consistently interpreted. *See e.g. Smith v. United Television, Inc., Special Severance Plan*, 474 F.3d 1033, 1037 (8th Cir. 2007)("the Committee has consistently interpreted the phrase at issue … One month prior to initially denying [plaintiff's] claim, the Committee interpreted the phrase in precisely the same manner"); *Leighton v. Delta Air Lines, Inc.,* 2022 WL 980301, at *7 (D. Minn. Mar. 31, 2022)("Defendants point to a nonbinding prior arbitration as evidence of such consistency"); *Davidson v. Wal-Mart Assoc. Health and Welfare Plan*, 305 F. Supp. 2d 1059, 1088 (S.D. Iowa 2004)(relying on "an affidavit from a Committee Member that states the Committee has consistently applied the exclusions" and "consistently interpreted the Plan documents" when evaluating whether "the administrator has applied the words at issue consistently.") The decision here is consistent with longstanding practice.

### 2. The decision is reasonable because it ensures that Section 3.06(c)(ii) is not rendered meaningless.

Under Section 3.06(c)(ii), "no actuarial increase will be provided for months in which a Participant engages in Disqualifying Employment if the provisions of 29 C.F.R. §2530.203-3 are satisfied." A.R.153. The Trustees' determination that the reference to Disqualifying Employment in Section 3.06(c)(ii) includes participants who continued working in covered employment after NRA but without commencing benefits ensures that Section 3.06(c)(ii) is not rendered meaningless. Plaintiff was engaged in Disqualifying Employment after NRA and is not entitled to an actuarial increase as a result. Plaintiff interprets into the plan an exception to Section 3.06(c)(ii) that carves out his work in Disqualifying Employment because it was uninterrupted by benefit payments. No such exception exists because if it did, it would render Section 3.06(c)(ii) meaningless.

### 3. The interpretation is reasonable because it is not contrary to the Plan's clear language.

Plaintiff cobbles together several references in the Plan to make the strained argument that a participant cannot be working in Disqualifying Employment unless benefits have commenced.[11] In asserting this argument Plaintiff deliberately ignores the relevant text of Section 3.06(c)(ii) that expressly refers to §2530.203-3. That regulation contains a broad definition of section 203(a)(3)(B) service that encompasses "the employment of an employee subsequent to the time the payment of benefits commenced or *would have commenced if the employee had not remained in* or returned to *employment*

---

[11] *See e.g.* ECF 41, ¶¶11, 15.

results in section 203(a)(3)(B) service during a calendar month." 29 C.F.R. §2530.203-3(c)(2)(emphasis added). Plaintiff likely ignores this express language, which directly addresses his situation, because it shows why the Trustees' interpretation was reasonable and why his own argument lacks merit.

### 4. The decision is reasonable because it is consistent with Plan goals.

The Trustees' decision is reasonable because it treats similarly situated participants equally. *See e.g. Leighton*, 2022 WL 98301 at *6 ("Because Delta's interpretation of the Plan promotes equal treatment of plan participants, this supports the reasonableness of the … interpretation). Conversely, Plaintiff's interpretation would turn this goal on its head. As explained in the letter denying Plaintiff's appeal, Plaintiff's proposed interpretation of the Plan "would result in substantially different financial outcomes for similarly situated participants." A.R. 44. One participant could retire at NRA and then immediately return to work while the other participant simply works past NRA. *Id.* Under Plaintiff's interpretation, the first participant would not receive an actuarial increase but the second participant would receive one even though both worked continuously in covered employment. *Id.* "The Plan is intended to uniformly treat similarly situated participants." *Id.* The Trustees' interpretation rather than Plaintiff's achieves that Plan goal. *See Guzman v. Building Services 32BJ Pension Fund,* 2023 WL 2526093, *15 (S.D.N.Y., Mar. 15, 2023)(rejecting proposed interpretation of when benefits could be suspended that turned on "exactly whether the participant retired and then resumed work or continued to work throughout" based on a similar example illustrating that participants in essentially the same position would be treated differently); *Ingram,* 812 F.3d at 637 (administrator's

interpretation "reasonably avoided benefit disparities between similarly situated retiring participants"). Any comparison of Plaintiff's claim against the Plan language reveals that Plaintiff's arguments are entirely inconsistent with Plan goals.

<strong>5.    <em>The decision is reasonable because it does not conflict with ERISA.</em></strong>

The Trustees' decision does not conflict with ERISA. The Eighth Circuit has specifically held that a pension plan is not required to provide an actuarial increase to employees who continue working after NRA. "ERISA does not require an actuarial increase in benefits to compensate for the period after [NRA] that payment of benefits is deferred because the recipient continues to work." *Atkins et al. v. Northwest Airlines, Inc.*, 967 F.2d 1197, 1201 (8th Cir. 1992)(citing 29 U.S.C. §1056(a)(3)). This is true for employees who retire, commence benefits, and then return to work, and for employees who continue working past NRA without commencing benefits. *Id.* at 1201-1202. The Eighth Circuit specifically considered and rejected an argument that ERISA Section 203(a)(3)(B) applies only to persons who have retired, started receiving pension benefits, and then resumed work. *Id.*

Like the appellants in *Atkins*, Plaintiff suggests that he is entitled to an actuarial increase because he did not retire, did not commence benefits, and did not then become re-employed. Plaintiff's argument should be rejected because no such actuarial increase is required by ERISA (or the Plan). *See also Contilli v. Local 705 Int'l Bhd. of Teamsters Pension Fund*, 559 F.3d 720, 722 (7th Cir. 1992)(Federal law permits retirement plans to forego making actuarial adjustments for employees who remain in Section 203(a)(3)(B) service); *Canada v. American Airlines, Inc. Pilot Retirement Ben. Program*, 572 Fed.

Appx. 309, 311 (6th Cir. 2014)(same); *Laurent v. PriceWaterHouseCoopers LLC*, 448 F.

Supp. 2d 537, 555 (S.D. N.Y. 2006)("When continued benefits accruals are provided for

employment beyond [NRA], ERISA does not require further actuarial adjustment to a

participant's accrued benefit"); *Person v. Teamsters Local Union 863,* 2013 WL 5676739,

at *5 (D. N.J., Oct. 13, 2013)("Plaintiff has not pointed to any ERISA section requiring

that he receive an actuarial increase in his benefits reflecting the time he delayed retirement

and continued working.") Under the *Finley* factors, the Trustees' decision that Plaintiff is

not entitled to an actuarial increase was reasonable and must be affirmed. Defendants are

therefore entitled to summary judgment.

### B.   *Plaintiff's alleged notice deficiencies do not require an actuarial increase*.

Plaintiff also alleges that he is entitled to an actuarial increase because the

Suspension Notice did not reference the term of art, "Disqualifying Employment," failed

to reference applicable Plan provisions, failed to provide a copy of Plan provisions, and

failed to explain the procedures and time frame to request review. ECF 41, ¶¶55-56. The

argument that insufficient/deficient notice entitles a participant to an actuarial increase has

been repeatedly rejected. Although not binding, the Eastern District of Michigan decision

in *Monks v. Keystone Powdered Metal Co.,* is strikingly similar to the present case. 78 F.

Supp. 2d 647 (E.D. Mich. 2000). In *Monks,* the court found that an employee who

continued working for the same employer in the same position after reaching NRA was not

entitled to an actuarial increase in his retirement benefits because such an increase is not

required for periods when the employee was engaged in disqualifying employment. *Id.* at

666-670. The plan failed to provide *any* notice to Monks that it was suspending his benefits

because he remained employed after reaching NRA. *Id.* at 667. Monks claimed that because the plan failed to provide this required notice, he was entitled to elect between (i) his monthly benefit as it continued to accrue under the Plan during his two additional years of service and (ii) the actuarially adjusted value of his monthly benefit computed as of his normal retirement date. *Id.* The court rejected Monks' argument that he was entitled to the actuarial adjusted value. *Id.* ERISA did not mandate "an affirmative damages recovery based merely on the plan administrator's failure to adhere to proper notification and disclosure procedures." *Id.* at 668.

Unlike the plaintiff in *Monks*, Plaintiff actually received a Suspension Notice advising that his benefits were being suspended. A.R.1-3. Plaintiff was clearly advised that "benefit payments not made to [him] during [his] period of employment after age 62 [were] being permanently withheld and forfeited," that "when [he] ultimately retire[d] from covered employment, [his] Plan benefit will be based on the total months of pay and service at [his] actual retirement age," and that he could "have the Plan review the suspension of his benefits." A.R.1-3. Indeed, Plaintiff admitted in correspondence to the Trustees that his "retirement benefits were suspended two years ago when [he] continued to work past" age 62. A.R.5.

Plaintiff's suggestion that the Suspension Notice should have provided more detail does not give rise to an affirmative damages recovery in the form of an actuarial increase and Defendants are thus entitled to summary judgment. Indeed, in *Monks*, the court found that an actuarial increase was not required even though the plaintiff did not receive *any* notice regarding the suspension of benefits. *Monks,* at 667. *See also Allbaugh v. California*

*Field Ironworkers Pension Trust*, 2014 WL 2112934 (D. Nev., May 20, 2014)(plaintiff not entitled to an actuarial adjustment even though notice was not provided); *Brightman v. 1199SEIU Health Care Employees Pension Fund*, 2021 WL 809373 (S.D.N.Y., March 2, 2021)(plaintiff was properly notified of suspension of benefits even though the notice did not include a description of the appeals process because the appeals process was outlined in the Plan Document, the SPD, and correspondence). Defendants are entitled to summary judgment on Count One.

## II. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S FIDUCIARY BREACH CLAIM.

A claim for breach of fiduciary duty under ERISA requires three elements: "1) defendant was a fiduciary of the plan, 2) defendant was acting in that capacity, and 3) defendant breached a fiduciary duty." *In re Xcel Energy, Inc., Sec. Derivative & "ERISA" Litig.*, 312 F. Supp. 2d 1165, 1175 (D. Minn. 2004). Plaintiff's first effort in asserting this claim was dismissed due to Plaintiff's failure to plead even the most basic elements required to establish a fiduciary breach. As explained below, Plaintiff's second effort also misses the mark. Plaintiff's alleged fiduciary breaches can be generally described in three categories: (1) alleged breaches related to the Suspension Notice (ECF 41, ¶¶59-63); (2) alleged breaches related to the SPD (*Id.* ¶¶64-66, 71); and (3) an alleged breach committed by "relying on the advice of their attorney" even though some trustees, who were never deposed in this matter, supposedly said they agreed with Plaintiff's position (*Id.* ¶¶67-70). Defendant is entitled to summary judgment on all theories.

**A.**    <u>*Defendants' Suspension Notice did not constitute a fiduciary breach.*</u>

As discussed above, the argument that insufficient notice of a benefits suspension entitles a participant to an actuarial increase has been repeatedly rejected by courts across the country. *See supra* at 29-31 In addition, Plaintiff admitted that he did not change his retirement plans based on the Suspension Notice. Drentlaw Dec. at Ex. B at 44:5-12. Finally, as discussed above, the Plan requires the suspension of benefits for participants who work in Disqualifying Employment after NRA even if they have not yet commenced benefits (*see supra* at 23-29), so the Suspension Notice itself is not "contrary to the Plan requirements" as Plaintiff claims and cannot constitute a fiduciary breach. ECF 41 ¶62. *See Thornton v. Graphic Comm. Conf. of the Int. Brotherhood of Teamsters Supplemental Ret. and Dis. Fund*, 566 F.3d 597, 617 (6th Cir. 2009)(where underlying conduct did not violate ERISA, claim for fiduciary breach fails).

**B.**    <u>*The SPD was not materially misleading and Plaintiff did not reasonably rely on it to his detriment.*</u>

In order to establish a fiduciary breach claim based on alleged misstatements, the misstatements must be "materially misleading." *Delker v. MasterCard International, Inc.*, 21 F. 4th 1019, 1025 (8th Cir. 2022). "A statement is materially misleading if substantially likely to mislead a reasonable employee making decisions about employer benefits and entitlements." *Id.* (citing *Kalda v. Sioux Valley Physician Partners, Inc.*, 481 F.3d 639, 644 (8th Cir. 2007)). "In addition to demonstrating that pertinent statements were materially misleading, a plaintiff must further establish that he reasonably relied to his detriment on

such statements in order to succeed on an ERISA misrepresentation claim." *Delker*, 21 F. 4th at 1025.

Here, Plaintiff does not even allege that the SPDs were *materially* misleading. More importantly, Plaintiff admitted that he did not change his retirement plans based on the SPDs. Drentlaw Dec. at Ex. B at 28:10-12; 51:12-14. In other words, Plaintiff did not rely on the alleged non-materially misleading SPDs when he decided to continue working. Rather, the "main reason" he worked past NRA was because he thought he was receiving a service credit increase. *Id.* at 33:11-34:4; 35:17-36.16. He then continued working because he agreed to complete a specific work project. *Id.* at 48:17-23;49:12-50:5.[12]

Even if Plaintiff relied on the SPDs, his reliance must have been reasonable. Here, the SPD clearly stated that "disqualifying employment" means "work in the industry for a contributing employer or self-employment within the Union's geographical and trade jurisdiction in the same or related business as any contributing employer." A.R.226. Plaintiff claims to have been confused because this clear language was included under a heading that said "What happens if I resume work after I retire?" Reliance on headings is not reasonable. *See Guzman,* 2023 WL 2526093 at *14 ("Although Plaintiff is correct that the title of the relevant section is titled 'Reemployment After Retirement' and several other provisions discuss this suspension rule in the context of someone who has retired and then returns to work, this does not mean that the scope of the suspension rule is confined to this

---

[12] Plaintiff did not rely on the Suspension Letter and Suspension Notice either. *Id.* at 44:5-12.

set of circumstances. The heading of a provision is not determinative of the scope of a contractual provision"); *Canada v. Am. Airlines, Inc. Pilot Ret. Ben. Program,* 2010 WL 4877280 at *14 (M.D. Tenn. Aug. 10, 2010), *aff'd as modified,* 572 F. App'x 309 (heading not controlling).

Moreover, the language of a plan summary is not legally binding. *Cigna Corp. v. Amara*, 563 U.S. 421, 437 (2011). In affirming the denial of a claim nearly identical to Plaintiff's, the Sixth Circuit summarized *Amara's* treatment of SPDs as follows:

> [In *Amara*], the Court concluded that while SPDs provide "clear, simple communication" to beneficiaries *about* the plan, their statements are not legally binding plan terms themselves. In so holding, the Court noted that "[t]o make the language of a plan summary legally binding could well lead plan administrators to sacrifice simplicity and comprehensibility in order to describe plan terms in the language of lawyers." Thus, when a plan beneficiary brings suit under 29 U.S.C. §1132(a)(1)(B) to clarify his rights to future benefits "under the plan," as [plaintiff] did here, he may not rely on the contents of SPDs to circumscribe or nullify the plain terms of the plan itself.[13]

*Canada,* 572 Fed. Appx. at 314 (internal citations omitted). *See also Amara,* 563 U.S. at 446 ((J. Scalia, concurring in judgment, joined by J. Thomas) ("An SPD, moreover, would not fulfill its purpose of providing an easily accessible summary of the plan if it were an

---

[13] This is particularly true in this case where the SPDs expressly advise participants on the very first page that "your benefits are determined by the Plan, not this SPD" and advised participants how to request a full copy of the Plan. A.R. 218; 236.

authoritative part of the plan itself; the minor omissions appropriate for a summary would risk revising the plan").[14]

**C.**    ***Defendants did not breach their fiduciary duties by relying on their attorney.***

Plaintiff claims that Defendants breached their fiduciary duty by relying on the reasonable advice of counsel rather than conducting a separate investigation based on statements purportedly made by current and former trustees who supposedly agreed with Plaintiff's Plan interpretation. ECF 41 ¶¶67-70.[15] Plaintiff, who did not depose a single witness to support his fiduciary breach claim, is incorrect.

As an initial matter, Plaintiff's claimed fiduciary breach presupposes that the Plan Counsel's advice was wrong. As demonstrated above, Plan Counsel's recommendation was reasonable and in accord with the Plan's language and ERISA. Even if Plan Counsel's recommendation was incorrect, the Trustees were entitled to rely on their attorney in determining whether Plaintiff was entitled to the benefits he sought. ERISA's fiduciary duty of prudence requires the exercise of "care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like

---

[14] Plaintiff's Complaint asserts a theory of equitable estoppel. ECF 41, ¶75. Plaintiff has not, however, alleged that Defendants intended for Plaintiff to act based on the representation. *See Brubaker v. Deere & Co.*, 972 F. Supp. 2d 972, 993 (S.D. Iowa 2009).
[15] Plaintiff also claims "[b]ased on information from a long-tenured former trustee of the Plan, actuarial increases have been given to employees who worked in Covered Employment after" NRA. ECF 41, ¶70. Such increases were provided to participants who were not sent a Suspension Notice or who worked only intermittently in Disqualifying Employment. Doblar Dec. ¶¶12-13; 17-19.

aims." 29 U.S.C. §1104(a)(1)(B). Indeed, where a fiduciary does not have expertise or education on a particular matter, ERISA's prudence standard obligates the fiduciary to seek the assistance of an expert. *See e.g. Bussian v. R.J.R. Nabisco, Inc.*, 233 F.3d 286, 300-01 (5th Cir. 2000); *Donovan v. Beirwirth,* 680 F.2d 263, 272-73 (2d Cir.), *cert. denied,* 469 U.S. 1069 (1982). Recognizing this concept, the Restatements expressly provide that the "Trustees shall be entitled to rely … upon all opinions given by any counsel selected or approved by the Board of Trustees." A.R.114 (§9.01); A.R.169 (§4.16). The law recognizes this concept too. Trustees are not required to be legal experts, and in ERISA cases, it is a principle firmly rooted and founded in the common law of trusts that a fiduciary may rely on the advice of counsel when reasonably justified under the circumstances." *Clark v. Feder Semo & Bard, P.C.,* 739 F.3d 28, 31-32 (D.C. Cir. 2014). Relying on Plan Counsel's interpretation of the Plan, which was supported by a well-reasoned legal memorandum (A.R.41-42), under the circumstances before the Trustees cannot be a breach of fiduciary duty.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that the Court grant summary judgment in their favor.

Dated: August 30, 2024        **TAFT STETTINIUS & HOLLISTER LLP**

By: */s/ Stacey L. Drentlaw*
         Ernest F. Peake (#212453)
         Stacey L. Drentlaw (#285201)
2200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Phone:       612-977-8400
Facsimile:    612-977-8650
Email:        epeake@taftlaw.com
               sdrentlaw@taftlaw.com

**Attorneys for Defendants**