### UNITED STATES DISTRICT COURT
### DISTRICT OF MINNESOTA

James Grandson,

                          Plaintiff,

v.

Western Lake Superior Piping Industry Pension Plan and Board of Trustees of the Western Lake Superior Piping Industry Pension Plan,

                          Defendants.

Case No. 0:23-cv-00214-JMB-LIB

### MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff's motion for summary judgment should be denied. Section 3.06(c)(ii) of the 2020 Plan Restatement, which governs the calculation of Late Retirement Benefits, plainly says that "no actuarial increase will be provided for months in which a Participant works in Disqualifying Employment if the provisions of 29 C.F.R. §2530.203-3 are satisfied." Notwithstanding the plain language of Section 3.06(c)(ii), which references the specific issue of whether an actuarial increase is available for months when a participant continued working in Disqualifying Employment after reaching Normal Retirement Age ("NRA"), Plaintiff directs the Court to impermissibly substitute his own piecemeal interpretation of the Plan in place of Defendants' reasonable Plan reading so that he can receive an actuarial increase not available to him under the Plan. Under the abuse-of-discretion standard required here, Defendants' determination that Plaintiff was not owed an actuarial increase should be upheld because (i) it was reasonable under the Plan

1

language; (ii) it was consistent with longstanding Plan interpretation and the Plan's goal of treating participants equally; (iii) it ensures that the relevant Plan provision is not rendered meaningless; and (iv) it does not conflict with ERISA. Likely knowing Defendants' decision was not an abuse of discretion, Plaintiff impermissibly navigates around fairly straight forward law by interjecting elements of his fiduciary breach claim into the abuse-of-discretion analysis, claiming Defendants' reliance on its legal counsel constituted a conflict of interest. Indeed, Plaintiff actually suggests that the Trustees, who are not lawyers, breached their fiduciary duties by relying on the advice of Plan Counsel and the TPA. Plaintiff also claims that Defendants breached their fiduciary duties by providing him with misleading SPDs and a misleading notice regarding the suspension of his benefits prior to his decision to continue working for his longtime employer after turning 62 (NRA under the Plan). But review of Plaintiff's deposition, which was the only deposition taken in the case, shows that neither the SPDs nor the letter and notice sent to Plaintiff just prior to his sixty-second birthday caused Plaintiff to change his retirement plans, which necessarily means that Plaintiff did not rely to his detriment on the documents about which he complains, and therefore cannot establish his claim for fiduciary breach. Based on the evidence and law, Plaintiff's motion for summary judgment should be denied, and summary judgment should instead be awarded to Defendants.[1]

_____

[1] Defendants filed their own Motion for Summary Judgment. *See* ECF 59 and 61.

## RESPONSE TO PLAINTIFF'S STATEMENT OF FACTS

Plaintiff provides an incomplete and one-sided version of certain facts. ECF 55, pp. 10-15. Although some of the facts referenced by Plaintiff are incomplete and thus require additional context or detail, Defendants do not dispute most of the facts contained in Plaintiff's five-page Factual Background, and to the extent a factual dispute exists, it is not material. Defendants also note that some of Plaintiff's "facts" are actually self-serving characterizations rather than actual facts. When viewed in appropriate context, the facts show that summary judgment should be granted to Defendants rather than Plaintiff.

1.      Defendants agree that shortly before Plaintiff turned 62, normal retirement age, or "NRA", the Third Party Administrator, Wilson-McShane Corporation ("TPA") sent Plaintiff a letter dated November 1, 2019 with the subject line: "Suspension of Retirement Benefits Notice" ("Suspension Letter") that enclosed a Notice of Suspension of Retirement Benefits ("Suspension Notice"). *Id.* Defendants also agree that Plaintiff accurately quotes a portion of the Suspension Letter. ECF 55, p. 10. Plaintiff's factual assertions, however, are incomplete and lack context. In addition to the short excerpt quoted by Plaintiff, the Suspension Letter expressly advised Plaintiff that: "As long as you are working, you will continue to accumulate benefits under the Plan" and "[w]hen you retire, your benefits will be based on your plan service record at your actual age." A.R.1.[2] In addition, the Suspension Notice advised Plaintiff of the following:

> [I]f a participant is employed by a contributing employer after age 62, payment of pension benefits is delayed until the participant's actual

---

[2] "A.R." refers to the Administrative Record (ECF 63-1).

retirement date. *Benefit payments that are not made to you during your period of employment after age 62 are being permanently withheld and forfeited.* However, *when you ultimately retire from covered employment, your Plan benefit will be based on the total months of pay and service at your actual retirement age.*

A.R.2 (emphasis added). The Suspension Notice also referred Plaintiff to Section 2530.203-3 of the Code of Federal Regulations for "further information on this suspension of pension benefit payments", provided the phone number of the TPA in case Plaintiff had questions, and advised that Plaintiff could "have the Plan review the suspension of [his] benefits." *Id.*

2.     Defendants do not dispute that the specific words "Disqualifying Employment" were not included in the Suspension Letter or Suspension Notice. ECF 55, p. 11. As additional context and as more fully quoted in the preceding paragraph, the Suspension Letter and Suspension Notice specifically advised Plaintiff that "[b]enefit payments that are not made to [him] during [his] period of employment after age 62 are being permanently withheld and forfeited" and that "when [he] ultimately retire from covered employment, [his] Plan benefit will be based on the total months of pay and service at [his] actual retirement age." A.R.2.

3.     Plaintiff contends that "[t]he Notice did not include the information required by the regulations or the Pension Plan to qualify as notice that benefits would be permanently suspended." ECF 55, p. 11. While Defendants do not dispute that the Suspension Notice did not include all of the content required under the applicable regulations or that there was a typographical error that cited to Section 1.1 of the Plan rather than Section 1.14 (the definition of Disqualifying Employment contained in the 2015

4

Restatement), they note that most of the required information was included in the Suspension Notice (i.e. a description of specific reasons why benefit payments are being suspended, a general description of plan provisions relating to the suspension of payments, a statement that applicable DOL regulations can be found in §2530.203-3 of the CFR, and the procedure for obtaining a review of the benefits suspension).[3]

4.    Plaintiff also contends that "[t]he Notice did not inform Grandson that he had a right to appeal nor did the Notice give Grandson reason to appeal" ECF 55, p. 11. Although Defendants do not dispute that the Suspension Notice did not include the word "appeal," the Suspension Notice, when read in its entirety, specifically advised Plaintiff that he could have "the Plan review the suspension of [his] benefits" and obtain a copy of all plan documents. A.R.2. Defendants further note that notwithstanding the Suspension Notice's clear reference to work for a contributing employer after age 62 and its admonishment that "benefit payments not made to you during your period of employment after age 62 are being permanently withheld and forfeited," Plaintiff claims the Suspension Notice did not give him "reason to appeal." ECF 55, p. 11; A.R.2-3. While Defendants disagree with Plaintiff's incorrect and self-serving interpretation of whether the Suspension Notice gave him "reason to appeal," Plaintiff's characterization is not a factual assertion.

---

[3] With respect to Plaintiff's suggestion that that the Suspension did not "qualify as notice that benefits would be permanently suspended", Defendants note that whether the Suspension Notice "qualif[ied] as notice that benefits would be permanently suspended" is a legal rather than a factual question. *See infra,* at Section I.B.5, at pp. 24-25.

5.    Defendants agree that in mid-2021, Plaintiff inquired about the amount of his pension benefits upon retirement, including whether he was entitled to an actuarial increase related to his late retirement. ECF 55, p. 11.

6.    Defendants do not dispute that on November 8, 2021, the Board consented to the TPA requesting that Plaintiff put his questions in writing to allow Plan Counsel an opportunity to review the questions and prepare a response, and they do not dispute that the TPA sent Plaintiff a letter requesting that he prepare a letter with his "specific questions and inquiries." *Id.* As further context to Plaintiff's incomplete factual assertions, the letter further advised Plaintiff that the "Trustees of the Plan held discussion on [his] various questions and concerns" and that "in order to respond properly, they requested that [he] submit to the Board a letter providing specific questions and inquiries you have regarding the Plan." A.R.4. Defendants also note, that the Trustees discussed, at the November 8, 2021 board meeting, that Plaintiff had been in touch with the then-board chairman (Trustee Campeau) and the Fund Office, that Plaintiff "had posed several questions about how his benefit [would] be calculated once he retires," that "[t]he Fund Office had provided answers that were not satisfactory" to Plaintiff, and that Plaintiff "continued to ask additional questions." A.R.59.

7.    Defendants agree that on January 13, 2022, Plaintiff sent an email to the TPA in which he claimed that "the Plan and SPD require that his pension benefits be actuarially adjusted and that failing to do so would violate 29 C.F.R. §2530.203-3." ECF 55, p. 11; A.R.5. Although Defendants agree that Plaintiff sent the referenced email, his summary of its contents is incomplete. More specifically, in his January 13, 2022 email, Plaintiff

admitted that "my pension benefit was suspended two years ago when I continued to work past the normal requirement age of 62," and then quoted an inapplicable section of §2530.203-3 in support of his argument. A.R.5, 18-20.

8.    Defendants agree that Plan Counsel prepared a response to Plaintiff's questions, that the response was labeled as the "final determination on your appeal," and that the language quoted by Plaintiff appeared in the letter. ECF 55, p.11-12. Plaintiff incorrectly claims that there "in no evidence the response was sent to the Trustees" (ECF 55, p. 11). This statement is contradicted by the February 9, 2022 meeting minutes which indicate that Plan Counsel "reviewed a response" to Plaintiff's letter with the Trustees, and the fact that Plaintiff's email was appended to the response as an exhibit. A.R.12-16. Plaintiff also incorrectly states that the response did not discuss the terms of the Plan because the relevant Plan provision, Section 3.06(c)(ii) is specifically discussed in the response. A.R.15.

9.    Defendants do not dispute that Plan Counsel's response to Plaintiff was discussed at the February 9, 2022 board meeting or that the letter was sent to Plaintiff on February 10, 2022. ECF 55, p. 12. Plaintiff inaccurately describes the meeting minutes as "indicat[ing] that the Board did not have Grandson's email or the response prior to the meeting" when in fact, the minutes do not state when Plan Counsel's response, which had Plaintiff's email attached thereto, was made available to the Trustees. A.R.63-64. While Defendants agree that the minutes regarding Plaintiff's inquiry consist of only one paragraph and do contain specific details regarding the discussion, they note that Plaintiff's

suggestion that the meeting minutes should be longer or more detailed is not a factual assertion.[4]

10.     Defendants do not dispute that Plan Counsel sent the referenced April 12, 2022 email to the Trustees in which he recommended that the Trustees not engage in oral communications with Plaintiff. ECF 55, p. 12.

11.     Although Defendants agree that on August 8, 2022, Plaintiff sent a lengthy letter to the Trustees (ECF 55, p. 12; A.R.22-31), they note that the letter, which speaks for itself, is both confusing and difficult to read. A.R.22-31. In addition, Defendants dispute Plaintiff's characterization that the letter "provided a thorough explanation" of anything, including but not limited to providing "a thorough explanation of why "the terms of the 2020 Plan and SPD did not support" the Trustees' decision. *Id.* Defendants further note that Plaintiff's self-serving characterizations regarding what the letter said are not facts, and that, as noted, the letter speaks for itself.

12.     Plaintiff claims that his letter was not provided to the Trustees but was discussed at the August 30, 2022 Board meeting. ECF 55, p. 13. Plaintiff's suggestion that his letter was not provided to the Trustees is contradicted by his Amended Complaint, which states he sent the letter to the Trustees (ECF 41, ¶39) and the Administrative Record, which indicates that "the Trustees briefly reviewed" Plaintiff's August 8 correspondence

---

[4] Defendants further note that "[m]eeting minutes should not necessarily be expected to contain 'a verbatim transcript of all the issues considered by fiduciaries.'" *Kistler v. Stanley Black & Decker, Inc.*, 2024 WL 3292543, at *15 (D. Conn., July 3, 2024))(quoting *Falberg v. Goldman Sachs Group Inc.*, 2022 WL 4280634, at *12 (S.D.N.Y., Sept. 14, 2022).

(A.R.30). Defendants agree, however, that during the August 30, 2022 board meeting, Plan Counsel advised that Plaintiff's letter contained new claims and recommended that his arguments be considered by the Board. ECF 55, p. 13.

13.    While Defendants agree that Plan Counsel sent Plaintiff a letter dated September 6, 2022 and that the letter included the statements referenced by Plaintiff, they note that Plaintiff's characterization of the letter is incomplete because the letter also suggested that Plaintiff "consult an attorney to assist [him] in assembling [his] best arguments." ECF 55, p. 13; A.R.30-32.

14.    Defendants agree that Plan Counsel and Plaintiff had a conversation on September 7, 2022 that included discussion of the Plan *possibly* paying for an attorney to represent Plaintiff (ECF 55, p. 13), but Plaintiff's description of the call is incomplete and must be viewed in context. Plan Counsel provided the following summary of his conversation with Plaintiff in an email sent to Plaintiff on the same day as the phone call:

> In our discussion, I raised the *possibility* of a novel proposition designed to save money for everyone involved. As I said, I had no authority to make any proposition and my ruminations were in no way binding on the Trustees, my thought was that you will agree, in writing, to abide by the Board's decision in this matter, if the Board agrees that the Plan will pay the fees of an attorney of your choice (within reason – a $1200/hr DC EB attorney is not an option) to represent you in this matter.

A.R.33 (emphasis added). Plan Counsel further requested that "if this is an option you wish to explore" Plaintiff should notify Plan Counsel as soon as possible. *Id.*

15.    Defendants do not dispute that Plaintiff emailed Plan Counsel on September 13, 2022 and that the email included the statements referenced by Plaintiff. ECF 55, p. 13.

16.    Defendants do not dispute that in September 2022, Plaintiff completed a pension application, that he asked that it not be processed unless the Board decided in his favor, and that the application materials included a form for Plaintiff to sign, acknowledging that he had read and understood the Post-Retirement Employment Restrictions regarding retirement, disqualifying employment and notification of re-employment. ECF 55, p. 13.

17.    Although Defendants agree that on October 20, 2022, the TPA sent an email to Plan Counsel that included the Suspension Letter and Suspension Notice sent to Plaintiff and a statement about how the TPA handled "the NRA and late retirement process" (ECF 55, p. 13), Plaintiff's summary is incomplete. In addition to the information identified by Plaintiff, the email specifically described how late retirement benefits are calculated:

> If a Participant has stopped working in disqualifying employment at or before NRA, and just waited to start collecting, they would get an actuarial increase to their total pension benefit. If they continued to work in disqualifying employment after NRA they would get all years and hours at the age of retirement (no actuarial increase). If a Participant works less than 40 hours in a month in disqualifying employment after NRA, they would receive an actuarial adjustment for just the months they worked under 40 hours.

A.R.36.

18.    Defendants do not dispute that Plan Counsel prepared a memorandum at the Trustees' direction and that Plaintiff accurately quoted portions of that memorandum (ECF 55, p. 14), but as with many of Plaintiff's other factual assertions, Plaintiff's characterization of Plan Counsel's memorandum is incomplete. The memorandum also outlines how Plaintiff's proposed reading of the Plan did not make sense, how it would render Plan language meaningless, and that there was a "longstanding practice, confirmed

with Wilson McShane (the TPA), of denying late retirement increases to participants who work in covered employment past normal retirement age." A.R.41-42. Plan Counsel's memorandum further recommended that Plaintiff's appeal related to benefits accrued under the Variable Annuity Program ("VAP") be granted and that Plaintiff be awarded an actuarial increase with respect to that portion of his monthly pension benefit. *Id.*

19.    Defendants agree that Plan Counsel discussed the memorandum with the Trustees at the November 8, 2022 Board meeting, that they followed Plan Counsel's recommendation, and that the decision is documented in the meeting minutes. ECF 55, p. 14. Defendants also note that Plaintiff's suggestion that the meeting minutes should be longer or more detailed is not a factual assertion.[5]

20.    Although Defendants do not dispute that Plan Counsel sent Plaintiff a letter dated November 9, 2022 advising that the Trustees were not persuaded that Plaintiff was entitled to an actuarial increase or that the language referenced by Plaintiff was included in the letter (ECF 55, p. 14-15), Plaintiff's description of the letter is incomplete and omits key portions of the letter. The letter provided the following explanation of Defendants' decision:

> 1.    Your interpretation is contrary to the meaning of the Plan established by longstanding practice. Wilson McShane staff reviewed plan records and verified that those who continued working in covered employment past [NRA] age without commencing benefits did not receive a late retirement increase upon their eventual retirement.

---

[5] *See supra,* at footnote 4.

2.     Your interpretation would result in substantially different
financial outcomes for similarly situated participants. Two
participants attain [NRA]. One retires then immediately returns
to work. The other simply works past [NRA]. The participant
who drew a pension and then returned to work would not
receive a late retirement increase. Applying your
interpretation, the other participant would receive a late
retirement increase. But both participants worked continuously
in covered employment past normal retirement age. … The
Plan is intended to uniformly treat similarly situated
participants. Your interpretation is inconsistent with that intent.

3.     … If we interpret Section 3.06(c)(ii) as you assert, it would
apply only to those who have commenced benefits. That class
of participants can never be eligible for a late retirement
increase. Thus, Section 3.06(c)(ii) would not apply to you, or
anyone else, ever. It would be meaningless surplusage. In
contrast, if Section 3.06(c)(ii) applies to those who have not
commenced benefits, its meaning is appropriate in context,
consistent with longstanding practice, and in accord with
Treasury Regulations (26 C.F.R. 1.41(c)-1(f)(2))[6].

4.     Your interpretation ignores a portion of the relevant text of
Section 3.06(c)(ii). You focus on the term "Disqualifying
Employment". Section 3.06(c)(ii), when read in its entirety,
expressly refers to 29 C.F.R. §2530.203-3. That regulation
contains a broad definition of section 203(a)(3)(B) service that
you contend is missing from Section 3.06(c)(ii).

A.R.44. Defendants additionally note that Plaintiff's appeal was granted with respect to

benefits accrued under the VAP. A.R.43-45.

---

[6] "No actuarial adjustment to an accrued benefit is required on account of employment after
normal retirement age. For example, if a plan with a normal retirement age of 65 provides
a benefit of $400 a month payable at age 65 the same $400 benefit (with no upward
adjustment) could be paid to an employee who retires at age 68."

21.     Defendants agree that the November 9, 2022 letter advised that Plaintiff must file a lawsuit by February 10, 2023 (ECF 55, p. 15), and note that Plaintiff commenced this litigation on January 27, 2023, in advance of the February 10, 2023 deadline. ECF 1.

## ARGUMENT

## I.     PLAINTIFF IS NOT ENTITLED TO SUMMARY JUDGMENT ON COUNT ONE BECAUSE DEFENDANTS' DECISION WAS REASONABLE.

### A.     Standard of review.

Plaintiff concedes that in benefits due cases, if the Plan provides the administrator with discretionary authority, the court reviews the administrator's discretionary decisions under an abuse-of-discretion standard.[7] ECF 55, p. 15. Plaintiff also concedes that the 2020 Restatement "states that the Trustees have sole discretion to interpret and administer this Plan," meaning that "the discretionary decisions of the Trustees are entitled to deferential review." *Id.* (citing A.R.142). *See also* A.R.169 (§4.16). Stated another way, "[w]here an ERISA plan grants the administrator discretion to determine eligibility for benefits and to interpret the plan's terms, courts must apply a deferential abuse-of-discretion standard of review." *Green v. Union Sec. Ins. Co.*, 646 F.3d 1042, 1050 (8th Cir. 2011). Plaintiff agrees that under the deferential abuse-of-discretion review, "the court reverses the plan administrator's decision only if it was arbitrary and capricious, meaning it was unreasonable or unsupported by substantial evidence." ECF 55, p. 16.

---

[7] The Trustees are the Plan Administrator. A.R.114.

"A court is not to substitute its own judgment for that of the plan administrator." *Alexander v. Trane Co.*, 453 F.3d 1027, 1031 (8th Cir. 2006). The court must determine whether a "reasonable person *could* have reached a similar decision, given the evidence before him, not [whether] a reasonable person *would* have reached that decision." *Prezioso v. Prudential Ins. Co. of Am.*, 748 F.3d 797, 805 (8th Cir. 2014). *See also* ECF 55, p. 16 (Plaintiff acknowledges that the "court considers the entire record and determines whether a reasonable factfinder could reach the same outcome.")

Plaintiff and Defendants also agree that when assessing the reasonableness of the Trustees' decision, the Court should consider the five factors set forth in *Finley v. Special Agents Mut. Benefit Ass'n*, namely,

> Whether their interpretation is consistent with the goals of the Plan, whether their interpretation renders any language in the Plan meaningless or internally inconsistent, whether their interpretation conflicts with the substantive or procedural requirements of the ERISA statute, whether they have interpreted the words at issue consistently, and whether their interpretation is contrary to the clear language of the Plan.

957 F.2d 617, 621 (8th Cir. 1992). *See also* ECF 55, pp. 17-18. But contrary to Plaintiff's argument, the Trustees' decision that Plaintiff is not entitled to an actuarial increase due to his continued work in Disqualifying Employment after reaching NRA was unquestionably reasonable under the *Finley* factors.

**B.    The Trustees' decision was reasonable.**

As outlined below, Defendants' decision was reasonable under the *Finley* factors because it is consistent with longstanding practice, it is consistent with Plan goals, it ensures that Section 3.06(c)(ii) is not rendered meaningless, it is based on Section

14

3.06(c)(ii)'s incorporation of 29 C.F.R. §2530.203-3, and it does not conflict with ERISA. Because Defendants' decision was reasonable and therefore not an abuse of discretion, Defendants rather than Plaintiff are entitled to summary judgment.

### 1. The decision is reasonable because it is consistent with longstanding practice.

Defendants' decision that Plaintiff was not entitled to an actuarial increase due to his work at a contributing employer after NRA without commencing benefits was reasonable because it is consistent with the Plan's longstanding practice. During the fall of 2022, in connection with Defendants' reconsideration of Plaintiff's appeal, the TPA provided an overview of how late retirement benefits are calculated and reviewed Plan records to verify the Plan's longstanding practice of not providing actuarial increases to participants who continued working in Disqualifying Employment after NRA. ECF 62 (Declaration of Robert Doblar ("Doblar Dec.")) at ¶¶5-15.[8] *See also* A.R.42 (Plan Counsel's November 6, 2022 Memorandum, which referenced "the Plan's longstanding practice, confirmed with Wilson McShane [the TPA], of denying late retirement increases to participants who work in covered employment past [NRA]"); A.R.74 (November 8,

---

[8] More specifically, the TPA reviewed Plan records for the period between 2015 and November 2022, and determined there were 33 late retirees, many of whom stopped working in covered employment at NRA but did not immediately apply for retirement benefits, and therefore received an actuarial increase. ECF 62 (Doblar Dec.) at ¶13. Six late retirees continued working in covered employment and did not receive an actuarial increase when they retired. *Id.* ¶14. Two others received partial actuarial increases because they had worked more than 40 hours in Disqualifying Employment during some, but not all, months after NRA, and one late retiree received a partial actuarial increase because he was not sent a Suspension Notice until a year after reaching NRA. *Id.* ¶15.

2022 minutes which indicate that Plan Counsel's November 6, 2022 Memorandum was reviewed with the Trustees when they reconsidered Plaintiff's appeal).[9]

Plaintiff's attempts to discredit this longstanding and consistent application of not providing an actuarial increase to participants who, like Plaintiff, continued working in Disqualifying Employment after reaching NRA are unavailing. Plaintiff incorrectly claims that the Administrative Record does not include a verification regarding the TPA's review of Plan records and that there is no indication that the verification was discussed with the Trustees. ECF 55, p.19. As noted above, the Record includes a memorandum prepared by Plan Counsel that specifically states that the TPA confirmed the longstanding practice and the meeting minutes indicate that Plan Counsel's memorandum was reviewed during the meeting.[10] A.R.42, 74.

_____

[9] An additional review of late retiree files was conducted during discovery. That review identified 53 late retirees between 2007 and 2024, as follows: 20 late retirees who stopped working in Disqualifying Employment at NRA and received an actuarial increase; 16 late retirees who continued working in Disqualifying Employment after NRA and did not receive an actuarial increase; five late retirees who continued working in Disqualifying Employment after NRA for more than 40 hours per months during some but not all months and received a partial actuarial increase for months when they worked less than 40 hours in Disqualifying Employment; one late retiree who was sent his Suspension Notice one year late and received partial actuarial increase; and 11 late retirees who were not sent a Suspension Notice, continued working in Disqualifying Employment after NRA and received an actuarial increase because they had not been sent the Suspension Notice. ECF 62 (Doblar Dec.) at ¶¶16-21.

[10] Plaintiff's criticism of the meeting minutes is unfounded: "[m]eeting minutes should not necessarily be expected to contain 'a verbatim transcript of all the issues considered by fiduciaries.'" *Kistler,* 2024 WL 3292543, at *15 (quoting *Falberg,* 2022 WL 4280634, at *12).

Moreover, even if the Administrative Record did not specifically indicate that the TPA confirmed the longstanding practice as stated in a memorandum that was reviewed with the Trustees at their November 8, 2022 board meeting, the Court can consider evidence outside the Record to determine if a plan provision has been consistently interpreted over time. *See e.g. Smith v. United Television, Inc., Special Severance Plan*, 474 F.3d 1033, 1037 (8th Cir. 2007)("the Committee has consistently interpreted the phrase at issue … One month prior to initially denying [plaintiff's] claim, the Committee interpreted the phrase in precisely the same manner"); *Leighton v. Delta Air Lines, Inc.*, 2022 WL 980301, at *7 (D. Minn. Mar. 31, 2022)("Defendants point to a nonbinding prior arbitration as evidence of such consistency"); *Davidson v. Wal-Mart Assoc. Health and Welfare Plan*, 305 F. Supp. 2d 1059, 1088 (S.D. Iowa 2004)(relying on "an affidavit from a Committee Member that states the Committee has consistently applied the exclusions" and "consistently interpreted the Plan documents" when evaluating whether "the administrator has applied the words at issue consistently.")

Plaintiff's contention that "the definition of 'Disqualifying Employment' was not added to the Plan until late 2019" is equally unavailing because it is wrong. "Disqualifying Employment" was a defined term in the 2015 Restatement that was in effect when the Suspension Notice was sent to Plaintiff and when Plaintiff reached the Plan's NRA. A.R.82-83.[11] The first *Finley* factor, whether the Plan has been consistently administered,

---

[11] Plaintiff cites to A.R.130, which reflects a 2019 amendment to the definition of Disqualifying Employment. ECF 55, p.19. Defendants also note that the concept of disqualifying employment and the suspension of benefits that results from it, was also

weighs heavily in favor of upholding Defendants' decision to deny Plaintiff an actuarial increase due to his continued work in Disqualifying Employment after NRA.

### 2. The decision is reasonable because it is consistent with Plan goals.

Defendants' decision is reasonable because it fulfills the Plan goal of treating similarly situated participants equally. *See e.g. Leighton v. Delta Air Lines, Inc.,* 2022 WL 980301, at *6 (D. Minn. Mar. 31, 2022) ("Because Delta's interpretation of the Plan promotes equal treatment of plan participants, this supports the reasonableness of the … interpretation). Conversely, Plaintiff's interpretation and desired outcome would turn the goal of consistent treatment of participants on its head. This was clearly explained to Plaintiff in the November 9, 2022 letter denying reconsideration and rejecting Plaintiff's proposed interpretation of Section 3.06(c)(ii):

> Your interpretation would result in substantially different financial outcomes for similarly situated participants. Two participants attain [NRA]. One retires then immediately returns to work. The other simply works past [NRA]. The participant who drew a pension then returned to work would not receive a late retirement increase. Applying your interpretation, the other participant would receive a late retirement increase. But both participants worked continuously in covered employment past [NRA]. They are the same in all economic respects. The Plan is intended to uniformly treat similarly situated participants. Your interpretation is not consistent with that intent.

A.R.44. A similar example of treating similarly situated participants equally was used by the Southern District of New York when it rejected the same argument that Plaintiff asserts here:

---

included in prior versions of the Plan. *See e.g.* ECF 56-2 (2008 Restatement at §6.7); ECF 56-4 (2010 Restatement at §6.6).

> This broader interpretation of when pension benefits may be suspended – which does not turn on exactly whether the participant retired and then resumed work or continued to work throughout – also makes sense. Under Plaintiff's interpretation, a participant's retirement benefits could be suspended for several years based purely on the fact that the participant had retired for a single week after turning sixty-five and thereafter resumed employment, while another participant who did not retire for a week, but was in all other respects, identical, would not have her retirement benefits suspended.

*Guzman v. Building Services 32BJPension Fund,* 2023 WL 2526093, *15 (S.D.N.Y., Mar. 15, 2023). Defendants' interpretation of Section 3.06(c)(ii), which results in equal treatment of the two classes of participants discussed in the above examples, is reasonable and should be upheld.

Ignoring Defendants' well-reasoned example regarding equal treatment of similarly situated participants, Plaintiff claims that "participants whose benefits have commenced are clearly not similarly situated to participants who have not commenced benefits." ECF 55, p. 20. But as demonstrated by the two participants discussed in the two examples above, a participant who retires and commences benefits at NRA and then immediately returns to work is similarly situated to a participant who simply continues working past NRA without commencing benefits. Defendants' interpretation, which treats these two categories of participants equally, is reasonable. *See Guzman,* 2023 WL 2526093, *15. The second *Finley* factor favors upholding Defendants' decision to deny Plaintiff an actuarial increase due to his continued work in Disqualifying Employment after NRA because it achieves the Plan goal of treating participants equally regardless of whether they retired and then immediately resumed work or simply continued working after NRA.

19

**3.** ***The decision is reasonable because it ensures that Section 3.06(c)(ii) is not rendered meaningless.***

The Plan provides for a Late Retirement Benefit as follows:

**3.06 Amount of Benefit at Retirement**

The amount of the monthly retirement benefit to be provided in the Normal Form to a Participant will be determined as follows:

(c)    Late Retirement Benefit. A participant's retirement benefit on a Late Retirement Date shall be equal to the greater of (i) or (ii) below:

(i)    The Accrued Benefit on the Late Retirement Date.

(ii)    The Actuarial Equivalent of the Normal Form on the Normal Retirement Date. *However, no actuarial increase will be provided for months in which a Participant engages in Disqualifying Employment if the provisions of 29 C.F.R. §2530.203-3 are satisfied.*

A.R.153 (§3.06(c))(emphasis added). *See also* A.R.22 (§4.04(c)). Defendants' decision that Plaintiff is not entitled to an actuarial increase based on his work in Disqualifying Employment after NRA is reasonable because it ensures that Section 3.06(c)(ii) is not rendered meaningless. Defendants' rationale regarding this point was clearly articulated in the November 9, 2022 letter:

If we interpret Section 3.06(c)(ii) as you assert, it would apply only to those who have commenced benefits. That class of participants can never be eligible for a late retirement increase. Thus, Section 3.06(c)(ii) would not apply to you, or anyone else, ever. It would be meaningless surplusage. In contrast, if Section 3.06(c)(ii) applies to those who have not commenced benefits, its meaning is appropriate in context, consistent with longstanding practice, and in accord with Treasury Regulations (26 C.F.R. 1.411(c)-1(f)(2)).

A.R.44. Plaintiff claims that Defendants' interpretation is not reasonable, suggesting it renders the Suspension of Benefits provision meaningless because "the Suspension of

Benefits applies only to a Participant who has commenced benefits." ECF 55, p. 20. But Plaintiff himself has acknowledged that his benefits were suspended when he continued to work past NRA: "As you know, my pension benefit was suspended two years ago when I continued to work past the normal retirement age of 62." *See* A.R.5. Plaintiff's admission that his benefits were suspended due to his continued work after NRA makes it is clear that the Suspension of Benefits provision is not meaningless; it was utilized to suspend Plaintiff's benefits. A.R.5

Plaintiff was notified that his benefits were suspended due to his ongoing work after NRA through the November 1, 2019 Suspension Notice, which expressly advised him that the Plan's NRA was 62 and that

> … if a participant is employed by a contributing employer after age 62, payment of pension benefits is delayed until the participant's actual retirement date. *Benefit payments that are not made to you during your period of employment after age 62 are being permanently withheld and forfeited.* However, *when you ultimately retire from covered employment, your Plan benefit will be based on the total months of pay and service at your actual retirement age.*

A.R.2 (emphasis added). The Suspension Notice further advised that additional information about "the suspension of pension benefit payments" is available at §2530.203-3 and advised that review of the benefits suspension could be obtained. *Id.* Plaintiff did not request that his benefits suspension be reviewed even though he has acknowledged that his benefits were suspended.[12] A.R.5. Instead, Plaintiff now seeks an actuarial increase that is

---

[12] As argued in Defendants' Memorandum in Support Defendants' Motion for Summary Judgment, Defendants are entitled to summary judgment based on Plaintiff's failure to

expressly precluded by Section 3.06(c)(ii) and in a manner directly contrary to what he was clearly told in November 2019, *i.e.*, that when he "ultimately retire[d] from covered employment, [his] Plan benefit [would] be based on the total months of pay and service at [his] actual retirement age." A.R.2. Plaintiff's hyper-technical attempt to tie when benefits can be suspended to "whether the participant retired and then resumed work or continued to work throughout" was considered and rejected by the Southern District of New York in *Guzman* and should likewise be rejected here. *Guzman,* 2023 WL 2526093, *15. Under the third *Finley* factor, Defendants' interpretation of Section 3.06(c)(ii) is reasonable and should not be disturbed by the Court.

### 4. The decision is reasonable because it is based on Section 3.06(c)(ii)'s incorporation of 29 C.F.R. §2530.203-3.

Defendants' decision is reasonable because Section 3.06(c)(ii) incorporates 29 C.F.R. §2530.203-3; "no actuarial increase will be provided for months in which a Participant engages in Disqualifying Employment if the provisions of 29 C.F.R. §2530.203-3 are satisfied." A.R.153 (§3.06(c)(ii))(emphasis added). *See also* A.R.22 (§4.04(c)(ii)). As explained to Plaintiff in the November 9, 2022 letter detailing Defendants' decision:

> Your interpretation ignores a portion of the relevant text of Section 3.06(c)(ii). You focus on the term "Disqualifying Employment". Section 3.06(c)(ii), when read in its entirety, expressly refers to 29 C.F.R. §2530.203-3. That regulation contains the broad definition of section 203(a)(3)(B) service that you contend is missing from Section 3.06(c)(ii).

---

exhaust his administrative remedies by seeking timely review when his benefits were suspended through the November 1, 2019 letter. ECF 61, pp. 18-20.

A.R.44. That regulation contains a broad definition of section 203(a)(3)(B) service that encompasses "the employment of an employee subsequent to the time the payment of benefits commenced or *would have commenced if the employee had not remained in* or returned to *employment* results in section 203(a)(3)(B) service during a calendar month." 29 C.F.R. §2530.203-3(c)(2)(emphasis added). Plaintiff's continued work at a contributing employer after NRA falls within this definition because it was "the employment of an employee subsequent to the time the payment of benefits … would have commenced if the employee had not remained in … employment."

Plaintiff contends, without support, that Section 3.06(c)(ii)'s reference to the provisions of 29 C.F.R. §2530.203-3 being satisfied does not incorporate the definition of section 203(a)(3)(B) service set forth in 29 C.F.R. §2530.203-3(c) as interpreted by Defendants. Plaintiff suggests instead, that the "reference in the Plan to the regulation refers to the suspension *rules* in §2530.203-3(b), since the Plan states the regulation must be satisfied." ECF 55, p. 21. Plaintiff's suggested alternate reading is not enough to establish that Defendants' interpretation is unreasonable. The Court "is not to substitute its own judgment for that of the plan administrator." *Alexander*, 453 F.3d at 1031. The Court must instead determine whether a "reasonable person *could* have reached a similar decision, given the evidence before him, not [whether] a reasonable person *would* have reached that decision." *Prezioso,* 748 F.3d at 805. And "[w]here a plan fiduciary offered a reasonable interpretation of a disputed plan provision, 'courts may not replace it with an interpretation of their own – and therefore cannot disturb as an 'abuse of discretion' the challenged benefits determination.'" *Ingram v. Terminal R.R. Ass'n of St. Louis Pension Plan for*

*Nonschedule Workers,* 812 F.3d 628, 634 (8th Cir. 2016)(quotation omitted). Defendants'
interpretation that §2530.203-3(c)'s definition of section 203(a)(3)(b) was incorporated
into §3.06(c)(ii) of the Plan is reasonable, and the fourth *Finley* factor supports upholding
Defendants' decision.

**5.      *The decision is reasonable because it does not conflict with ERISA.***

The final *Finley* factor also favors upholding Defendants' benefits determination.
The Eighth Circuit has specifically held that "ERISA does not require an actuarial increase
in benefits to compensate for the period after [NRA] that payment of benefits is deferred
because the recipient continues to work." *Atkins et al. v. Northwest Airlines, Inc.*, 967 F.2d
1197, 1201 (8th Cir. 1992)(citing 29 U.S.C. §1056(a)(3)). This is true for employees who
retire, commence benefits, and then return to work, and for employees who continue
working past NRA without commencing benefits. *Id.* at 1201-1202. The Eighth Circuit
specifically considered and rejected an argument that ERISA Section 203(a)(3)(B) applies
only to persons who have retired, started receiving pension benefits, and then resumed
work. *Id.*[13] Courts have also rejected the argument that insufficient/deficient notice entitles
a participant to an actuarial increase. *See Monks v. Keystone Powdered Metal Co.,* 78 F.
Supp. 2d 647 (E.D. Mich. 2000); *Allbaugh v. California Field Ironworkers Pension Trust*,

---

[13] *See also Contilli v. Local 705 Int'l Bhd. of Teamsters Pension Fund*, 559 F.3d 720, 722
(7th Cir. 1992); *Canada v. American Airlines, Inc. Pilot Retirement Ben. Program*, 572
Fed. Appx. 309, 311 (6th Cir. 2014); *Laurent v. PriceWaterHouseCoopers LLC*, 448 F.
Supp. 2d 537, 555 (S.D. N.Y. 2006); *Person v. Teamsters Local Union 863,* 2013 WL
5676739, at *5 (D. N.J., Oct. 13, 2013).

2014 WL 2112934 (D. Nev., May 20, 2014); *Brightman v. 1199SEIU Health Care Employees Pension Fund*, 2021 WL 809373 (S.D.N.Y., March 2, 2021). The *Finley* factors establish that Defendants' decision was reasonable, and that Defendants rather than Plaintiff should be granted summary judgment.

### C.    Plaintiff's suggestion that a conflict of interest or procedural irregularities support a finding that the Trustees abused their discretion should be rejected.

Plaintiff improperly attempts to color the Court's analysis through references to a conflict of interest and procedural irregularities.[14] Plaintiff's attempt to bolster his deficient argument that the Trustees abused their discretion when they found he was not entitled to an actuarial increase should be rejected.

First, Plaintiff's conflict of interest argument fails as a matter of law. According to Plaintiff, "where the defendant both funds the plan and decides the claim, it is operating under a conflict of interest which must be considered by the court." ECF 55, p. 16 (citing *Metropolitan Life Ins. Co. v. Glenn*, 54 U.S. 105 (2008)). Although Plaintiff attempts to interject the concept of a conflict of interest into the Court's analysis, he never alleges that Defendants both fund the plan and decide the claim. Nor can he. As stated in the 2015 and 2020 Restatements, it is the Employers and not the Trustees that fund the Plan: "Employers will make Contributions to the Fund according to the terms of applicable collective

---

[14] *See e.g.* ECF 55, pp. 16-17; 23-25.

bargaining agreements or participation agreements." A.R.94 (§3.01); A.R.159 (§4.01).[15]

Because the Employers fund the Plan while the defendant Trustees decide claims, a conflict

of interest does not exist.

Without citation to any legal authority, Plaintiff tries to manufacture a new type of

conflict by claiming that "the Trustees were aware that their attorney had a strong opinion

about his prior recommendation." ECF 55, p. 23. Plaintiff then impermissibly imports his

fiduciary breach claim into his benefits due claim under the guise of a conflict of interest.

*See* ECF 55, pp. 23-24 ("the Trustees were aware that Grandson felt the Trustees followed

Counsel's recommendation without independent analysis" and "should have taken steps to

interpedently ensure that prior Counsel's interpretation of the Plan was correct").[16]

Plaintiff's attempt to create a conflict of interest where none exists should be rejected and

the Court should ignore Plaintiff's allegations that the Trustees' decision on his benefits

due claim was unreasonable due to a conflict of interest.

---

[15] *See also* A.R.82 (§1.12) and A.R.180 (§5.12)(Defining "Contributions" as "payments due from an Employer to this Plan under a collective bargaining agreement or participation agreement"); A.R.83 (§1.19); A.R.182 (§5.20)(Defining "Employer" as "an employer that is a member of the Association and that, pursuant to and under the terms of a collective bargaining agreement between Employer members of the Association and the Union, contributes to the Trust Fund for the benefit of its Eligible Employees …")

[16] Plaintiff also contends, in support of his conflict of interest theory, that "a red flag should have gone up when prior Counsel offered to pay for Grandson's attorney in exchange for accepting the Trustees' decision." ECF 55, p. 24. In addition to making up a conflict where none exists, Plaintiff overstates the Administrative Record, which indicates that what Plan Counsel actually offered to do was to "explore" the "possibility" of the Plan "pay[ing] the fees of an attorney of your choice" to represent him. A.R.33.

Second, Plaintiff argues that "procedural irregularities also support an abuse of discretion finding." ECF 55, p. 23. The alleged "procedural irregularities" referenced by Plaintiff include the placement of conditions on Plaintiff's right to seek reconsideration and "significant procedural errors." *Id.*, p. 25. Plaintiff ignores that the Plan contains no right to reconsideration in the first place, so he was actually treated more fairly than required by the 2015 and 2020 Restatements.

Moreover, Plaintiff cites only one case in support of his argument that "the significant procedural errors limited Grandson's rights would support a finding that Defendants abused their discretion." *Id.* According to Plaintiff, *Chronister v. Unum Life Ins. Co. of Am.* supports a finding that Defendants abused their discretion because there was an "egregious" failure to follow their claims-handling procedures. ECF 55, p. 25 (citing *Chronister*, 563 F.3d 773,776 (8th Cir. 2009)). Plaintiff fails to note that the claims-handling procedures Unum "egregiously" failed to follow in *Chronister* "were put into place pursuant to settlement agreements and consent decrees between Unum and various state insurance commissioners and the Department of Labor after investigations into Unum's claims-handling procedures." *Id.* at 776, n. 3. In addition to Unum's failure to follow claims-handling procedures put into place as a result of state and DOL investigations into its claims-handling practices, the Eighth Circuit also cited Unum's financial conflict of interest that "led to a 'disturbing pattern of erroneous and arbitrary benefit denials, bad faith contract misinterpretations, and other unscrupulous tactics'" in support of its finding that Unum's claim denial was an abuse of discretion and further noted that the "Supreme Court itself commented on Unum's 'history of biased claims

administration.'" 563 F.3d at 776 (citations omitted). Simply put, *Chronister* does not support Plaintiff's claim that Defendants here abused their discretion when they found that Plaintiff was not entitled to an actuarial increase to his pension benefits. Plaintiff's motion for summary judgment on Count One should be denied.

## II.    PLAINTIFF IS NOT ENTITLED TO SUMMARY JUDGMENT ON COUNT TWO BECAUSE HE CANNOT ESTABLISH THE NECESSARY ELEMENTS OF A FIDUCIARY BREACH CLAIM.

Plaintiff claims that Defendants breached their fiduciary duties because: (1) the SPD misled Plaintiff; (2) the Suspension Notice was deficient and misleading; and (3) the Trustees failed to conduct an adequate investigation regarding Plaintiff's benefit claim. Plaintiff cannot establish all necessary elements to support these claims, and he is therefore not entitled to summary judgment.

### A.    Plaintiff cannot establish a fiduciary breach claim based on the SPD.

#### 1.    *Plaintiff did not rely the SPDs to his detriment.*

In order to establish a breach of fiduciary duty claim based on alleged misstatements, the misstatements must be "materially misleading." *Delker v. MasterCard International, Inc.*, 21 F. 4th 1019, 1025 (8th Cir. 2022). "A statement is materially misleading if substantially likely to mislead a reasonable employee making decisions about employer benefits and entitlements." *Id.* (citing *Kalda v. Sioux Valley Physician Partners, Inc.*, 481 F.3d 639, 644 (8th Cir. 2007)). "In addition to demonstrating that pertinent statements were materially misleading, a plaintiff must further establish that he reasonably relied to his detriment on such statements in order to succeed on an ERISA misrepresentation claim." *Delker*, 21 F. 4th at 1025.

28

In arguing that he is entitled to summary judgment because he was supposedly misled by the SPDs, Plaintiff enumerates several claimed deficiencies in the SPDs. ECF 55, pp. 27-28. Plaintiff does not, however, argue that any of the statements in the SPDs were "materially misleading" or that he "reasonably relied to his detriment on such statements." That is because there is zero evidence to support the argument. Plaintiff admitted at his deposition that he did not change his retirement plans based on the SPDs. ECF 63-2 (Grandson Deposition) at 28:10-12; 51:12-14. In other words, Plaintiff did not rely on the allegedly misleading SPDs when he decided to continue working after NRA. Rather, the "main reason" Plaintiff worked past NRA was because he thought he was receiving a service credit increase. *Id.* at 33:11-34:4; 35:17-36.16. He then continued working because he agreed to complete a specific work project. *Id.* at 48:17-23;49:12-50:5.

Likely because there is no factual support for the required element of reliance, Plaintiff claims instead that "[t]here are no genuine issues of material fact because Defendants' breaches are based on the SPDs prepared by them." ECF 55, p. 28. But the fact that Defendants prepared the SPDs is not enough to establish the necessary element of reliance, and indeed, if all that is required to support a fiduciary breach claim  is to claim that a breach was based on an SPD prepared by the defendant, the defendant would automatically lose in every case fiduciary breach involving an SPD. Plaintiff's fiduciary claim regarding the SPDs necessarily fails because he cannot present any evidence to show that he actually relied on the SPDs to his detriment.

### 2.    Even if Plaintiff relied on the SPDs, such reliance must be reasonable.

To the extent Plaintiff claims, in his reply memorandum, that he relied on the SPDs, his fiduciary breach claim would still fail because such reliance must have been reasonable. Here, the SPDs clearly stated that "disqualifying employment" means "work in the industry for a contributing employer or self-employment within the Union's geographical and trade jurisdiction in the same or related business as any contributing employer." A.R.226. Plaintiff claims to have been confused because this clear language was included under a heading that said "What happens if I resume work after I retire?" Reliance on headings is not reasonable. *See Guzman,* 2023 WL 2526093 at *14 ("Although Plaintiff is correct that the title of the relevant section is titled 'Reemployment After Retirement' and several other provisions discuss this suspension rule in the context of someone who has retired and then returns to work, this does not mean that the scope of the suspension rule is confined to this set of circumstances. The heading of a provision is not determinative of the scope of a contractual provision"); *Canada v. Am. Airlines, Inc. Pilot Ret. Ben. Program,* 2010 WL 4877280 at *14 (M.D. Tenn. Aug. 10, 2010), *aff'd as modified,* 572 F. App'x 309 (headings are not controlling).

### 3.    The language in the SPDs is not legally binding.

Moreover, the language of a plan summary is not legally binding. *Cigna Corp. v. Amara*, 563 U.S. 421, 437 (2011). Here, the SPDs advised participants on the very first page that "your benefits are determined by the Plan, not this SPD" and told participants how to request a full copy of the Plan. A.R. 218; 236.

In affirming the denial of a claim nearly identical to Plaintiff's, the Sixth Circuit

summarized *Amara's* treatment of SPDs as follows:

> [In *Amara*], the Court concluded that while SPDs provide "clear, simple
> communication" to beneficiaries *about* the plan, their statements are not
> legally binding plan terms themselves. In so holding, the Court noted that
> "[t]o make the language of a plan summary legally binding could well lead
> plan administrators to sacrifice simplicity and comprehensibility in order to
> describe plan terms in the language of lawyers." Thus, when a plan
> beneficiary brings suit under 29 U.S.C. §1132(a)(1)(B) to clarify his rights
> to future benefits "under the plan," as [plaintiff] did here, he may not rely on
> the contents of SPDs to circumscribe or nullify the plain terms of the plan
> itself.

*Canada,* 572 Fed. Appx. at 314 (internal citations omitted). *See also Amara,* 563 U.S. at

446 ((J. Scalia, concurring in judgment, joined by J. Thomas) ("An SPD, moreover, would

not fulfill its purpose of providing an easily accessible summary of the plan if it were an

authoritative part of the plan itself; the minor omissions appropriate for a summary would

risk revising the plan"). Plaintiff claims that Defendants should have provided more detail

in the SPDs, but inclusion of the level of detail suggested by Plaintiff would result in SPDs

that are as long and as detailed as the underlying plan documents. That is not what is

required under *Amara.*

### 4.    *The cases on which Plaintiff relies are distinguishable.*

The two cases on which Plaintiff relies in support of his claim that Defendants'

SPDs were misleading are distinguishable. With respect to *Amara*, the summary provided

to participants differed significantly from the terms of the plan itself. 563 U.S. at 428-429.

More specifically, the summary wrongly informed participants that: (a) the new plan would

"significantly enhance" the retirement program; (b) the new plan "would produce 'an

overall improvement in … retirement benefits,' and would provide 'the same benefit security' with 'steadier benefit growth,'" (c) participants "would 'see the growth in [their] total retirement benefits'" every year; (d) the "initial deposit 'represent[ed] the full value of the benefit [they] earned for service before 1998;'" and (e) "'[o]ne advantage the company *will not* get from the retirement program changes is cost savings.'" *Amara*, 563 U.S. at 428-429. In contrast to these inaccurate representations, "the new plan saved the company $10 million annually," the "initial deposit did not 'represent[] the full value of the benefit' that employees had 'earned for service before 1998[,]'" and the new plan "made a significant number of employees worse off" in numerous respects. *Id.* at 429. These misrepresentations violated "ERISA §§102(a) and 104(b), which require a plan administrator to provide beneficiaries with summary plan descriptions and with summaries of material modifications, 'written in a manner calculated to be understood by the average plan participant,' that are 'sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan.'" *Id.* at 432.

The present case is different. Although Plaintiff contends that the SPDs should have included more detail regarding the precise manner in which late retirement benefits were calculated and more detail about when a participant would be deemed to be working in Disqualifying Employment, the language in Defendants' SPDs does not include the same types of false and inaccurate statements that were involved in *Amara.* Further, although Plaintiff complains that the SPDs did not "inform" him "that he would not receive an actuarial adjustment" for his late retirement benefit "if he continued working" and that the

discussion and heading related to disqualifying employment did not "inform the participants that it only applies where a participant retirees and begins receiving benefits and then resumes working (ECF 55, p. 27), Plaintiff was clearly advised of the following in the Suspension Letter and Suspension Notice:

- that he would "not receive any benefits as long as [he] remain[ed] employed, and the benefits [he] could otherwise have received are considered 'suspended'" (A.R.1);

- that when he did retire, his "benefits will be based on [his] plan service record at [his] actual age" (A.R.1);

- that "[b]enefit payments that are not made to [him] during [his] period of employment after age 62 are being permanently withheld and forfeited" (A.R.2); and

- that "when [he] ultimately retire from covered employment, [his] Plan benefit will be based on the total months of pay and service at [his] actual retirement age" (A.R.2).

Plaintiff's claim that the SPDs should have been more detailed should be rejected under *Amara*, particularly where he was also specifically advised about what would happen if he continued working after NRA and how his retirement benefit would be calculated when he stopped working in the Suspension Letter and Suspension Notice.

The second case on which Plaintiff relies, *Silva v. Metropolitan Life Ins. Co.*, is similarly distinguishable. 762 F.3d 711 (8th Cir. 2014). In *Silva,* MetLife, the defendant, denied a claim for life insurance benefits because the policy-holder had failed to provide "evidence of insurability," which was required under the terms of the plan. *Id.* at 714. According MetLife, "evidence of insurability" was established through submission of a "Statement of Health form." *Id.* at 715. Although MetLife claimed, after the policy-

holder's death, that it had never approved the insurance policy because no "evidence of insurability" was provided, MetLife had collected premiums for the policy. *Id.* at 723. The Eighth Circuit took issue with the denial of benefits based on the surrounding circumstances – the Statement of Health form was not mentioned in the plan document and was not in the court record, MetLife failed to provide evidence of the online prompt related to the Statement of Health form that they claimed should have been used, and there were around 200 other employees who had not submitted Statement of Health forms but were allowed to submit required documentation (which was not offered to the *Silva* plaintiff). *Id.* at 715. The Eighth Circuit elaborated that "it was arguably fraudulent for MetLife to collect premiums" from an employee who "never had an approved policy," particularly where "an internal MetLife investigation showed that roughly 200 [] employees had been paying premiums for policies that were never approved by MetLife." *Id.* at 723. In addition to various fiduciary violations by MetLife, MetLife had failed to provide any SPD whatsoever. *Id.* at 720-21. According to the plaintiff in *Silva*, if an SPD had been provided, it would have "listed the requirements for enrolling in a life insurance policy in an easy-to-understand format" and the "requirements to enroll in the Plan" would have been completed. *Id.* at 721. In the present case, Defendants provided SPDs and also advised Plaintiff in the Suspension Letter and Suspension Notice what would happen if he continued working after NRA and how his retirement benefits would be calculated when he stopped working. Plaintiff's reliance of *Silva* is therefore misplaced. Plaintiff is not entitled to summary judgment on his claim that Defendants breached their fiduciary duties based on the SPDs.

**B.** **Plaintiff cannot establish a fiduciary breach claim based on the Suspension Letter and Suspension Notice.**

**1.** *Plaintiff did not rely on the Suspension Letter and the Suspension Notice to his detriment.*

As with his claim that the SPDs were misleading, Plaintiff's claim that the Suspension Letter and Suspension Notice were misleading fails because Plaintiff provides no evidence whatsoever that he relied on them to his detriment. Indeed, he testified that he did not change his retirement plans based on the Suspension Letter and Suspension Notice. ECF 63-2 (Grandson Deposition) at 44:5-12. As noted above, in order to have a fiduciary breach based on alleged misstatements, a plaintiff must "establish that he reasonably relied to his detriment" on such statements. *Delker*, 21 F. 4th at 1025. Plaintiff cannot do that here.

**2.** *Plaintiff understood that his benefits were suspended.*

Moreover, Plaintiff understood that his benefits were being suspended as a result of his continued work for contributing employer after he reached NRA. In fact, he admitted this understanding in correspondence submitted to the Trustees: "As you know, my pension benefit was suspended two years ago when I continued to work past normal retirement age of 62." A.R.5. Although Plaintiff now claims that the Suspension Letter was "deceitful because it explained that the attached Notice meant that [his] benefit was being deferred, not forfeited," the Suspension Notice itself expressly advised that "[b]enefit payments that are not made to you during your period of employment after age 62 are being *permanently withheld and forfeited.*" A.R.2. (emphasis added).

Plaintiff relies on *Skelton v. Radisson Hotel Bloomington* for the proposition that Defendants should be held liable for the benefits "which Plaintiff thought he had." ECF 55, p. 31 (citing *Skelton*, 33 F. 4th 968, 979 (8th Cir. 2022). In *Skelton*, however, the plaintiff thought he had benefits because the defendant "told Skelton she would not pay premiums until it approved her [life insurance] application, but then took her premium without approving her application – profiting on its broken promise." *Skelton*, at 978. In contrast, Plaintiff was advised that benefit payments not made to him during his period of employment after age 62 were being permanently withheld and forfeited and that when he ultimately retired, his benefit would be based on the total months of pay and service at his actual retirement age. A.R.2. Plaintiff is not entitled to summary judgment on his claim that Defendants breached their fiduciary duties based on the Suspension Letter and Suspension Notice.

### C.    Plaintiff cannot establish a fiduciary breach claim based on the Trustees' alleged failure to conduct adequate investigation.

Plaintiff's claimed fiduciary breach presupposes that Defendants' decision regarding Plaintiff's benefits was not reasonable. As discussed in Section I.B above (*see supra* pp. 14-27), Defendants' determination that Plaintiff is not entitled to an actuarial increase due to his continued work in Disqualifying Employment was reasonable under the *Finley* factors and is entitled to deference.

In any event, even if Plan Counsel's recommendation was incorrect, and it was not, Defendants were entitled to rely on their attorney in determining whether Plaintiff was entitled to the benefits he sought. ERISA's fiduciary duty of prudence requires the exercise

of "care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. §1104(a)(1)(B). Indeed, where a fiduciary does not have expertise or education on a particular matter, ERISA's prudence standard obligates the fiduciary to seek the assistance of an expert. *See e.g. Bussian v. R.J.R. Nabisco, Inc.*, 233 F.3d 286, 300-01 (5th Cir. 2000); *Donovan v. Beirwirth,* 680 F.2d 263, 272-73 (2d Cir.), *cert. denied,* 469 U.S. 1069 (1982). Recognizing this concept, the Restatements expressly provide that the "Trustees shall be entitled to rely … upon all opinions given by any counsel selected or approved by the Board of Trustees." A.R.114 (§9.01); A.R.169 (§4.16). The law recognizes this concept too. Trustees are not required to be legal experts, and in ERISA cases, it is a principle firmly rooted and founded in the common law of trusts that a fiduciary may rely on the advice of counsel when reasonably justified under the circumstances." *Clark v. Feder Semo & Bard, P.C.,* 739 F.3d 28, 31-32 (D.C. Cir. 2014).

In the present case, Plan Counsel prepared a well-reasoned legal memorandum explaining why Plaintiff was not entitled to the actuarial increase with respect to the Defined Benefit Plan (referred to as "legacy benefits"). A.R.41-42. The memorandum prepared by Plan Counsel outlined the factual circumstances surrounding Plaintiff's claim for benefits, discussed the relevant Plan provision (3.06(c)(ii)), provided an example taken from the federal regulations regarding why Plaintiff was not entitled to the relief he sought, and indicated that the TPA had been consulted regarding how benefits had been administered when calculating benefits for late retirees like Plaintiff. A.R.41-42. In the

memorandum, Plan Counsel candidly admitted that Plaintiff was correct in his argument with respect to the VAP and recommended that Plaintiff's appeal be granted with respect to his benefits under the VAP. A.R.42. Moreover, Defendants' reliance on Plan Counsel's recommendation was expressly authorized by the Plan Documents and Defendants reasonably relied on Plan Counsel's advice under the circumstances. A.R.114 (§9.01); A.R.169 (§4.16); *Clark,* 739 F.3d at 31-32

The only case Plaintiff cites in support of his claim that making a reasonable decision based on the advice of Plan Counsel, with input from the Plan's TPA, can be viewed as a fiduciary breach for failure to conduct an independent investigation is distinguishable. In *Schaefer v. Arkansas Medical Soc.*, the plaintiff was a former plan trustee ("plaintiff-trustee") and a plan participant who recommended plan amendments that pension benefits be subject to an annual cost-of-living adjustment ("COLA") and that employees' fringe benefits be included as compensation for purposes of calculating retirement benefits. 853 F.2d 1487, 1489 (8th Cir. 1988). Plaintiff-trustee "conducted no investigation to determine the cost of the COLA provision or the legality of the fringe benefits provision" prior to presenting this recommendation to the trustees, and the trustees approved the plan amendments. *Id.* Plaintiff-trustee later retained a consultant to bring the plan into compliance with ERISA. *Id.* The consultant expressed reservations about the COLA provision and whether the plan could afford it, and further expressed reservations about the legality of the fringe benefits provision. *Id.* Plaintiff-trustee did not share the consultant's concerns with the other trustees. *Id.* After plaintiff-trustee retired and commenced receiving pension benefits, the cost of the COLA provision quickly rose, the

trustees became concerned about the plan's solvency, an investigation was commenced, plaintiff-trustee was removed from the board, the remaining trustees voted to terminate the plan, and plaintiff-trustee's request for supplemental benefits due based on the plan's termination was denied. *Id.* at 1490. Plaintiff-trustee sued the plan sponsor and remaining trustees for wrongful denial of supplemental benefits and the plan sponsor and remaining trustees counterclaimed, alleging plaintiff-trustee breached his fiduciary duty with regard to the plan amendments. *Id.* In assessing whether a six-year statute of limitations should be applied to the counterclaim based on plaintiff-trustee's constructive fraud, the court considered whether there had been justifiable reliance. *Id.* at 1491. In rejecting the six-year statute of limitation, the district court found that reliance was not justified because the plan sponsor and remaining trustees had "failed to investigate the merits of the proposals made by [plaintiff-trustee] to determine whether they were in the best interests of the Plan." *Id.* The Eighth Circuit affirmed, because the district court's findings that "Trustees made no independent investigation of the Plan's amendments … and relied solely on [plaintiff-trustee's] recommendations" were fully supported by the record. *Id.* In the present case, Defendants actually investigated Plaintiff's claim by requesting that Plan Counsel review the claim's legal merits and by considering the TPA's verification of the Plan's longstanding benefit administration practices. Plaintiff's reliance on *Schaefer* does not support his fiduciary breach claim.

Plaintiff's incomplete and misleading citations to several documents produced during discovery to support his argument that the Trustees should have conducted their own investigation instead of relying on Plan Counsel and the TPA fare no better. Plaintiff

first reiterates his incorrect suggestion that "the definition of 'Disqualifying Employment' had just been added to the Plan in 2019 despite the Plan using the terms for several years." As previously discussed, "Disqualifying Employment" was a defined term in the 2015 Restatement (A.R.82-83) and was not added to the Plan for the first time in 2019 as Plaintiff wrongly contends.[17]

Plaintiff next argues, in connection with his incorrect argument that the definition of Disqualifying Employment was first added to the Plan in 2019, that the meeting minutes from a May 17, 2019 board meeting "state the Plan's attorney presented the amendment to add 'Disqualifying Employment'" and that there were "inconsistencies between the Plan and SPD at the time of the amendment to the Plan in 2019." ECF 55, p. 31 (citing ECF 56-6 at p. 4). The minutes actually reflect that the referenced 2019 amendment was "regarding disqualifying employment and the claims and appeals procedures for retirement and disability benefits." *Id.* Although the minutes state that Plan Counsel "advised there were inconsistencies between the SPD and the Plan Document and this amendment clarifies the language," they do not state, as suggested by Plaintiff, that Plan Counsel "presented the amendment to add 'Disqualifying Employment'" (ECF 55, p. 31), nor do they state what those inconsistencies were or whether they related to disqualifying employment or the

---

[17] Plaintiff cites to A.R.130, which reflects a 2019 amendment to the definition of Disqualifying Employment. ECF 55, p.19. In addition, although not included in the definition section of the 2008 and 2010 plans that preceded the 2015 Plan, those earlier plans included the concept of disqualifying employment and the suspension of benefits that will result from it. *See e.g.* ECF 56-2 (2008 Restatement at §6.7); ECF 56-4 (2010 Restatement at §6.6).

"claims and appeals procedures for retirement and disability benefits" also addressed in the amendment. ECF 56-6 at p. 4. Moreover, the comments to the redlined version of the amendment presented to the Trustees indicate that the disqualifying employment provision was "revised to include same trade or craft as that which the participant was employed in at any time under the plan." ECF 56-5 at p. 3.[18]

The third document relied on by Plaintiff, an October 30, 2018 memorandum that addresses whether a retired participant's employment with the United Association ("U.A.") International constituted Disqualifying Employment, also misses the mark. ECF 55, p. 31 (citing ECF 56-7). Plaintiff focuses on one sentence, contained in a footnote of the memorandum that says: "Because a suspension of benefits violates ERISA's anti-forfeiture provision unless it satisfies the requirements of the regulation." *Id.* The language on which Plaintiff focuses was used to explain to the Trustees why they should read into the Plan language a requirement that was contained is 29 C.F.R. §2530.203-3 but not specifically stated in the Plan. According to the cited footnote, when read in its entirety:

> The Plan terms regarding suspension of benefits are tailored toward typical circumstances. As such, they are much more concise – and easier to understand – than the applicable regulation. However, in the somewhat unusual circumstance here, the key issue arises from a nuance of the regulation that is not expressly addressed in the Plan. Specifically, while the Plan defines disqualifying employment by reference to the industry, the regulation refers to industry *and trade*. Because a suspension of benefits violates ERISA's anti-forfeiture provision unless it satisfies the requirements

---

[18] Plan Counsel's comment that the existing definition of Disqualifying Employment was being "revised to include same trade or craft as that which the participant was employed in at any time under the plan" makes sense given the October 30, 2018 memorandum discussed in the next paragraph (which discusses that very topic).

> of the regulation, the participant's benefit cannot be suspended unless he is
> working in the same trade even through that is not required by the Plan's
> express language.

ECF 56-7, p. 1, fn. 2 (emphasis original). When taken in context, the October 30, 2018

supports the argument that Defendants can and should look at the definition of Section

203(a)(3)(B) employment contained in 29 C.F.R. §2530.203-3(c)(2) when interpreting the

Plan.[19] It also supports Defendants' arguments that it is appropriate for Trustees, who are

not lawyers, to rely on the advice their retained Plan Counsel and other Plan professionals,

such as the TPA, when addressing complex issues of Plan interpretation. Plaintiff is not

entitled to summary judgment on his fiduciary breach claim because Defendants relied Plan

Counsel and the TPA's confirmation of the Plan's longstanding practice when they

considered Plaintiff's claim.

## III.    PLAINTIFF IS NOT ENTITLED TO SUMMARY JUDGMENT ON COUNT THREE.

As discussed above, Plaintiff's motion for summary judgment should be denied and

instead, summary judgment should be granted to Defendants on Plaintiff's benefits due and

fiduciary breach claims. That necessarily means that Count Three, which seeks attorneys'

---

[19] Defendants further note that although the October 30, 2018 memorandum does not relate
to Plaintiff or his claim and is not part of the Administrative Record for Plaintiff's claim,
it supports Defendants' argument that their interpretation of Section 3.06(c)(ii) was
reasonable because it incorporated the requirements of 29 C.F.R. §2530.203-3(c)(2) by
reference. *See* Section I.B.4, *supra.* at pp. 22-24. It also contradicts Plaintiff's argument
that the reference to §2530.203-3 contained in Section 3.06(c)(ii) refers to the suspension
rules contained in §2530.203-3(b), rather than to the definition of Section 203(a)(3)(B)
employment for multiemployer plans set forth in §2530.203-3(c)(2) as interpreted by
Defendants.

fees, should also be dismissed and Plaintiff's request for attorneys' fees and costs should be denied. Even if Plaintiff achieves some success on the merits, an award of attorneys' fees and costs is discretionary and based on a number of factors. *See* 29 U.S.C. §1132(g)(1)( "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party"); *Eisenrich v. Minneapolis Retail Meat Cutters and Food Handlers Pension Plan*, 574 F.3d 644, 651-52 (8th Cir. 2009)(analyzing various factors and finding district court abused its discretion in awarding attorneys' fees to plaintiff).[20] Thus, the issue of whether attorneys' fees should be awarded to the prevailing party should be addressed following case resolution to allow briefing and analysis regarding whether assessment of fees and costs are appropriate under the facts and circumstances of the case.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiff's motion for summary judgment. Defendants further request that based on the arguments set forth in Defendants' Memorandum in Support of Summary Judgment, judgment be granted in favor of Defendants.

---

[20] Citing *Hardt v. Reliance Standard Life Ins. Co.*, Plaintiff incorrectly states that "the Supreme Court has held that fees *should* be awarded when there is some success on the merits. ECF 55, p. 33 (emphasis added). *Hardt* actually held that "a court, 'in its discretion' *may* award fees and costs' to either party" as long as the fee claimant has achieved 'some degree of success on the merits.'" 560 U.S. 242, 245 (2010)(emphasis added).

Dated: September 20, 2024        **TAFT STETTINIUS & HOLLISTER LLP**

By: */s/ Stacey L. Drentlaw*
       Ernest F. Peake (#212453)
       Stacey L. Drentlaw (#285201)
2200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Phone:      612-977-8400
Facsimile:   612-977-8650
Email:      epeake@taftlaw.com
           sdrentlaw@taftlaw.com

**Attorneys for Defendants**